295 F.2d 197
 John L. LEWIS, Henry G. Schmidt and Josephine Roche, as
Trustees of the United Mine Workers of America
Welfare and Retirement Fund of 1950, Appellees,
v.
F. Arnold LOWRY, individually and trading as Lowry Coal
Company, Appellant.
 No. 8298.
 United States Court of Appeals Fourth Circuit.
 Argued April 10, 1961.
Decided Sept. 16, 1961, Certiorari Denied Jan. 22, 1962, See
82 S.Ct. 478.
 
 Robert T. Winston, Jr., Norton, Va., and James S. Greene, Jr., Harlan Ky. (Greear, Bowen, Mullins & Winston, Norton, Va., on the brief), for appellant.
 Harold H. Bacon, Washington, D.C. (Val J. Mitch, Washington, D.C., T. G. Dudley, Annandale, Va., Clyde Y. Cridlin, Jonesville, Va., and M. E. Boiarsky, Charleston, W. Va., on the brief), for appellees.
 Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit judges.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 Summary judgment was entered for the plaintiffs in this suit by the Trustees for the Welfare and Retirement Fund of 1950 (United Mine Workers of America) against a mine operator for 'royalty' payments at the rate of forty cents per ton of coal mined by the defendant.[1] We think the summary judgment was inappropriate in the light of the factual issues tendered.
 
 
 2
 From May 1955 to August 1958 the defendant was engaged in a strip mining operation in Harlan County, Kentucky. He employed three or four men at a time in the operation, and during the entire period seven different individuals were employed by him in the work.
 
 
 3
 The defendant claims that shortly after the operation commenced, a representative of the United Mine Workers, Floyd, came to the job and demanded that he sign the National Butuminous Coal Wage Agreement of 1952 with its amendments. At that time, the defendant had only three employees, only one of whom, he claims, was a member of the U.M.W. Nevertheless, the defendant signed the agreement and later signed the subsequent agreements of 1955 and 1956. Though he admits that Floyd made no threats of any kind to him, he claims that he was duressed into signing these agreements because of his conviction, based upon violence in Harlan County, Kentucky in previous years, that, if he did not do so, he and his employees would suffer injury to their persons or their property. Perhaps inconsistently, but more importantly, the defendant claims that before signing the first agreement he explained to Floyd that he could not pay a royalty of forty cents a ton or the union wage scale, and that Floyd prevailed upon him to sign the agreement as a mere formality, but with the clear understanding that he would not be bound by it. The defendant says that he operated on that basis during the three years preceding 1955, and that it was recognized by Floyd that the defendant could not afford the wages and royalty payments specified by the national agreement, and that he was not expected to pay them.
 
 
 4
 The defendant also says that in performance he did not pay the wages required by the national agreement, that questions affecting working conditions were settled on the scene, and that he sent monthly checks to the plaintiffs in amounts which he felt he could afford and without regard to the tonnage of coal mined, this being in accordance with his claimed understanding with Floyd. These monthly payments to the plaintiffs were in small, even amounts. Seven of them were for $120 each, two of them were for $140 each, three of them were for $200 each, three of them were for $100 each, and the remainder were for similar, even moderate sums. The total of these payments aggregated $3,264, and the defendant suggests that neither the plaintiffs nor anyone else could have supposed that such even figures could have been based upon actual coal production. He points to his actual production figures which when computed for each month to a fraction of a ton in tenths and multiplied by forty cents a ton, would invariably produce an odd dollar amount for the royalty payment.
 
 
 5
 The plaintiffs claim that payments aggregating $52,795.40 should have been made to them and seek the recovery in this action, after crediting the defendant with the $3,264 he paid, of $49,531.40.
 
 
 6
 On summary judgment, the plaintiffs concede, as they must, that Floyd did and said everything that the defendant says he did and they accept the other fact asserted by the defendant.
 
 
 7
 The plaintiffs stand on the parol evidence rule and upon a theory that the policy of the National Labor Relations Act gives some added protection to labor agreements attacked as sham.
 
 
 8
 Before we give consideration to the legal issues tendered, we think the factual situation should be more fully developed. The defendant seeks to bring himself within the usual rule that an agreement which is purely pretensive and delivered with no intention that it is to be binding upon either party may be shown by parol evidence to have created no contractual obligations.[2] It may be a salutary limitation upon the rule that the bare assertion of the party to be bound is not enough to show that the purported contract was a pretense and a sham,[3] but here the defendant claims corroboration in the circumstances of his performance.
 
 
 9
 On the present record we think the facts are not sufficiently established to determine whether the situation is governed by the rule which denies enforcement of pretensive agreements or by the rule which forecloses the use of parol evidence to establish a contemporaneous oral agreement to vary the terms of a valid contract.
 
 
 10
 It is suggested, however, that a remand would be purposeless, and that the usual rule, which permits a party to show the real agreement, notwithstanding the existence of a pretensive writing, is inapplicable to collective bargaining agreements. The contention is founded principally upon that provision in the National Labor Relations Act[4] which requires that a collective bargaining agreement be reduced to writing if requested by either party. We find, however, no such broad and collateral effect of the statutory provision.
 
 
 11
 The requirement that collective bargaining agreements be reduced to writing came into the Act after a history of refusal by some employers to make a memorial of agreements reached in collective bargaining negotiations. The Congress was of the opinion that a refusal to record an agreement reached was not the sort of good faith bargaining required by the Act. The requirement, however, is directed to real agreement of the parties. It does not make sacrosanct a pretensive agreement inconsistent with the real agreement reached in the collective bargaining process.
 
 
 12
 If negotiators in a collective bargaining session should arrive at a complete agreement on the eve of April Fool's Day and, out of a perverted sense of humor, should reduce to writing, sign, and distribute a pretensive agreement far from the real agreement they had reached, surely either party could show that the pretensive agreement was in fact pretensive, and the right of each to require that the real agreement be reduced to writing would be preserved. The requirements of the Act are directed to the protection of the real agreement of the parties and not to alteration of accepted principles governing proof of the terms of the real agreement.
 
 
 13
 If, therefore, it should be made to appear that the union, for the sake of its relations with the larger mine operators, or for any other reason, insisted upon execution by the small operator of an agreement which in fact was pretensive and not the real agreement of the parties, nothing appears in the federal statutes which would prevent disclosure and proof of the real agreement between the union and the mine operator.
 
 
 14
 Finally, it is suggested that the plaintiffs, the Trustees of the Welfare and Retirement Fund, may have some greater right to enforce a pretensive agreement than would either of the immediate parties to it. The rights of the trustees, however, are entirely derivative. Their right to recover contributions from the mine operator is dependent entirely upon the real agreement between the operator and the union. The trustees have no independent right to insist that an operator make any contribution to the fund, or that it do so on the same basis and under the same formula that other operators contribute. The trustees are the third party beneficiaries of the real agreement between the union and operator, which they may enforce in accordance with its terms, but the fact that the suit is brought for the benefit of the third party beneficiaries would not foreclose a defense that there was no contract or that the writing upon which the complaint is based is not, in fact, the real agreement between the operator and the union.[5]
 
 
 15
 The judgment will be reversed and the case remanded for further proceedings.
 
 
 16
 Reversed and remanded.
 
 
 17
 SOBELOFF, Chief Judge (dissenting).
 
 
 18
 The District Court's action was sound and its judgment should not be disturbed.
 
 
 19
 Remand to the District Court is worse than useless since it is for the purpose of establishing a legal irrelevancy. This course is not justified because the only possible result of a trial on the issue of 'sham contract' would be to ascertain facts which could constitute no defense.
 
 
 20
 Lowry became a party to the industrywide collective bargaining agreement which obligated him to make royalty payments to the Trustees of the Welfare and Retirement Fund at the rate of $0.40 per ton. He regularly paid the fixed amount upon the number of tons he reported to the Trustees, reducing the total payments by the simple expedient of understating the tonnage in each of twenty-five payments made during the period in question. When the Trustees discovered from his reports to other agencies that his production was much greater than he had accounted for to the Trustees, they demanded payment of the difference due. Lowry did not interpose the present defense of 'sham agreement,' but sought to defend the correctness of the remittances made by him. He would not, however, agree to an inspection of his production records, either by a certified public accountant of his own choice or by accountants from the Trustees' office. It happens that each of his seven employees whose names Lowry remembered in his deposition had been certified by him from time to time to collect, and did collect, benefits from the Trust Fund.
 
 
 21
 However, my dissent is based not upon the defendant's lack of equity, but upon broader grounds, for this is not just a small case involving a few coal miners. If the present employer is permitted to circumvent his written collective bargaining agreement, the effects will be industry wide.[1]
 
 
 22
 There are three reasons why the defendant's allegations fail to constitute a defense to the suit by the Trustees. First, the statute authorizing agreements to establish industrial trust funds, properly interpreted, requires that such agreements shall be in writing. Second, broadly as a matter of federal labor law, the so-called 'sham' exception to the parol evidence rule should not be allowed in suits under collective bargaining agreements. Third, even if a private oral agreement, said to be the 'real contract,' could be relied upon by Lowry in a suit by the union, it cannot be asserted as against the Trustees.
 
 I.
 
 23
 In section 302 of the Labor Management Relations Act,[2] Congress shows a concern for the abuses accompanying the growth of the industrial trust funds. Primarily, it was feared that if the management of the funds was left entirely in the discretion of union officials, the money contributed by employers and by employees might not be used for welfare purposes. As Senator Taft said, 'Unless we impose some restrictions, we shall find that the welfare fund will become merely a war chest for the particular union * * *.'[3] One of the safeguards imposed by the act is that 'the detailed basis on which such payments are to be made is specified in a written agreement with the employer.'[4] According to the law's framers, the primary purpose of this provision was to enable employees to know what they were entitled to receive in welfare benefits and to be able to bring suit against the Trustees if necessary.
 
 
 24
 Literally read, section 302(c)(5)(B) may be thought to require that only the terms of the payments to the employees be in writing. Nevertheless, the protection of the employees is not complete unless the statute is read to require as well that the terms on which payments are to be made into the Trust Fund be similarly stated in writing. Congress could not have intended to safeguard against the improper use of money once it has been contributed to the fund, but not against evasion of the primary obligation to contribute.[5]
 
 
 25
 Further, it would be inconsistent to read the statute to require that the agreement as to terms of payment to the fund be in writing and yet to permit an employer to claim the 'sham' exception to the parol evidence rule. The royalty payments are an indirect method of compensating the employees,[6] and they have a right to know exactly what they are receiving for their services. They also have a right to know how well their union negotiators represented their interests. They are being deceived if the publicly declared, written agreement may be sapped by a secret compact. In addition, the establishment of this type of trust fund is generally made on an industry-wide basis. If some employers secretly contribute less than their shares, other employers may be forced to contribute more to enable the fund to meet its obligations.[7] Assuming that different royalties may be charged different employers, the other employers are at least entitled to know when someone is paying less per ton than they are. If then Congress has required that the agreement be reduced to writing, it cannot be supposed to have contemplated that a party may come into court with the defense, 'Yes, we have obediently put it is writing, but we did not mean it.' The salutary scheme to cushion the financial impact on employees and their families of unemployment, illness, old age and death could be reduced to chaos by a succession of such defenses as that attempted here, bringing in its train a host of social evils.
 
 II.
 
 26
 In respect to ordinary commercial contracts the high position accorded to written agreements, as witnessed by the parol evidence rule itself, may under some circumstances yield to the 'sham' exception.[8] Nevertheless, as a matter of substantive labor law, courts should not permit the exception.
 
 
 27
 A collective bargaining agreement has been called a 'generalized code'[9] for the industry to which it applies, and has been likened to a 'charter instrument of a system of industrial self-government, like words in a statute.'[10] If these are valid concepts, a union and an employer can no more make covert exceptions to the contract than a legislative body could to statute which it adopts. Both are frauds upon the constituencies concerned. This is not to say that a collective bargaining agreement may never be oral, but where the parties have put it into writing, as in the usual case, it may not be varied by a contradictory oral agreement.
 
 
 28
 The union is not bargaining for itself alone, but as a representative of employees, and sometimes of others such as the Trustees in the instant case. It is imperative that the employees and other direct beneficiaries have a written embodiment of their rights and duties which can be ascertained by all. The public also has a right to know precisely what was agreed upon. If this 'sham' exception is recognized, none of these interests will have any idea what the terms of the 'real' collective bargaining contract are.
 
 
 29
 We must have regard for the spirit of the legislation. Section 8(d) of the Labor Management Relations Act[11] has recognized the importance of having a collective bargaining contract in writing by providing that bargaining in good faith includes a willingness to embody the agreement in writing at the request of the other party. See H. J. Heinz Co. v. N.L.R.B., 1941, 311 U.S. 514, 523-526, 61 S.Ct. 320, 85 L.Ed. 309. A written labor agreement settles questions that if left unsettled could lead to industrial strife. Its purpose is to avoid strikes, walkouts, workstoppages and the like. If such written contracts can be nullified whenever the employer and union come to some other secret oral agreement, the purpose of the contract as an instrument of industrial peace may be frustrated.[12]
 
 III.
 
 30
 Even if it be assumed that in a suit by the union rather than the Trustees a sub-rosa understanding could be asserted by the employer, to allow the defense as against the Trustees would tend to undermine the statutory scheme for the creation of an irrevocable trust for the employees. The plan is one sponsored jointly by industry and labor and approved by Congress. The fund is jointly administered by representatives of employers and labor along with a neutral third party. It would be an unbearable incongruity, at war with the law's underlying policy, to allow the trust fund to be eroded in the manner proposed, for what kind of trust is it that leaves the door open to impairment by secret agreements, even those participated in by a donor?
 
 
 31
 TheSupreme Court in Lewis v. Benedict Coal Corp., 1960, 361 U.S. 459, 465, 80 S.Ct. 489, 493, 4 L.Ed.2d 442, pointed out that a trust fund is in 'no way an asset or property of the union.' See 93 Cong.Rec. 4678 (1947) (remarks of Senator Ball). In that case the trust fund was considered so far independent of the union that although a money judgment had been rendered in favor of the employer against the union, the employer was not permitted to use it as a set-off to a judgment against the employer in favor of the trustees. The considerations bearing on the protection of the interests of beneficiaries, which were stressed in Benedict, apply in logic and common sense with no less force here. Royalty payments to the Trustees may not be curtailed by private oral agreements between an employer and a union, any more than they were permitted to be reduced by damage claims of the employer against the union. The Trust Fund's obligation to pay benefits to Lowry's employees could not be affected by secret understandings between the coal company dnd the union; neither may the employer's obligation to pay royalties to the Trustees be diminished by clandestine arrangements between the employer and the union.
 
 IV.
 
 32
 The court's opinion treats the defense of coercion as frivolous, and with this I fully agree. No threats are claimed. The mere fear that if one will not sign the agreement there will be a strike or walk-out is not the kind of coercion that a court will recognize as sufficient to invalidate an agreement. This is elementary.[13] Certainly no remand is warranted to take testimony in support of this 'defense.'
 
 
 33
 For the above reasons, I think that the order of the District Court should be affirmed. Remand erroneously implies that if the facts that have been asserted could be established, they would constitute a valid defense. With this I do not agree.
 
 
 
 [1]
 Lewis v. Lowry, D.C.W.D.Va., 190 F.Supp. 490
 
 
 [2]
 Lewis v. Mears, D.C.W.D.Pa., 189 F.Supp. 503, affirmed 3 Cir., 297 F.2d 101; and see Burke v. Dulaney, 153 U.S. 228, 14 S.Ct. 816, 38 L.Ed. 698; In re Hicks & Son, Inc., 2 Cir., 82 F.2d 277
 
 
 [3]
 Rock-Ola Manufacturing Corporation v. Wertz, 4 Cir., 282 F.2d 208
 
 
 [4]
 29 U.S.C.A. 158(d)
 
 
 [5]
 One can imagine circumstances in which a pretensive agreement between the union and a mine operator might induce action by the Trustees or employees to their detriment. In such a situation an estoppel might arise or the union and the employer might be held responsible for the losses in a tort action. No such circumstances are developed on this record
 
 
 [1]
 The present case involves no 'April Fools' Day' joke, but is one of a series of attempts by coal operators over the nation to renege on their agreed-upon obligations with respect to the Union Welfare and Retirement Fund. For other cases where coal operators have attempted, unsuccessfully, to escape the payment of royalties to the Welfare Fund, some of them involving the same contentions as in the instant case and some involving different ones, see: Lewis v. Fentress Coal and Coke Company, D.C.M.D.Tenn.1958, 160 F.Supp. 221, affirmed 6 Cir., 1959, 264 F.2d 134; Lewis v. Mearns, D.C.N.D.W.Va.1958, 168 F.Supp. 134, affirmed 4 Cir., 1959, 268 F.2d 427; Lewis v. Quality Coal Corporation, 7 Cir., 1959, 270 F.2d 140, certiorari denied 1960, 361 U.S. 929, 80 S.Ct. 369, 4 L.Ed.2d 353; Lewis v. Cable, D.C.W.D.Pa.1952, 107 F.Supp. 196; Lewis v. Hixson, D.C.W.D.Ark.1959, 174 F.Supp. 241; Lewis v. Kerns, D.C.S.D.Ind.1959, 175 F.Supp. 115; Lewis v. Mill Ridge Coals, Inc., D.C.E.D.Ky.1960, 188 F.Supp. 4; Lewis v. Young & Perkins Coal Company, D.C.W.D.Ky.1960, 190 F.Supp. 838; Lewis v. Gilchrist, D.C.N.D.Ala.1961, 198 F.Supp. 239. For one case upholding a contention similar to that of the defendant in the present case, see Lewis v. Mears, D.C.W.D.Pa.1960, 189 F.Supp. 503 affirmed 297 F.2d 101
 
 
 [2]
 61 Stat. 157(1947), as amended, 29 U.S.C.A. 186 (Supp.1960)
 
 
 [3]
 93 Cong.Rec. 4747 (1947)
 
 
 [4]
 Labor Management Relations Act 302(c)(5)(B), 61 Stat. 157-58 (1947), as amended, 29 U.S.C.A. 186(c)(5)(B) (Supp.1960)
 
 
 [5]
 See William Dunbar Co. v. Painters & Glaziers Dist. Council, D.C.D.C.1955, 129 F.Supp. 417, 423
 
 
 [6]
 Lewis v. Benedict Coal Corp., 1960, 361 U.S. 459, 469, 80 S.Ct. 489, 4 L.Ed.2d 442
 
 
 [7]
 See Lewis v. Benedict Coal Corp., supra, 1960, 361 U.S. at page 469, 80 S.Ct. 489
 
 
 [8]
 The parties are in disagreement as to whether under Kentucky law, if applicable, the 'sham' exception to the parol evidencerule is recognized. I find it unnecessary to decide this
 
 
 [9]
 United Steelworkers v. Warrior & Gulf Nav. Co., 1960, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (Douglas, J.)
 
 
 [10]
 United Steelworkers v. American Mfg. Co., 1960, 363 U.S. 564, 570, 80 S.Ct. 1363, 1364, 4 L.Ed.2d 1432 (Brennan, J., concurring). See Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich.L.Rev. 1, 22-36 (1958)
 
 
 [11]
 61 Stat. 142 (1947), 29 U.S.C.A. 158(d) (1956)
 
 
 [12]
 The majority opinion suggests in footnote 5 that an employer might be estopped from asserting an oral understanding with the union contradicting their written agreement if it were shown that the Trustees or employees acted to their detriment. The simple answer is that specific detriment to these third parties is not required to be shown to invoke the rule against secret evasion of the written agreement because detriment is inherent in the frustration of Trustees' and employees,' rights which has been fully pointed out above in the text
 
 
 [13]
 See e.g., Lewis v. Quality Coal Corporation, 7 Cir., 1959, 270 F.2d 140; Lewis v. Kerns, D.C.S.D.Ind.1959, 175 F.Supp. 115