697 F.2d 562
 112 L.R.R.M. (BNA) 2001, 95 Lab.Cas. P 13,924,
3 Employee Benefits Ca 2417
 SINAI HOSPITAL OF BALTIMORE, INC.; The Johns Hopkins
Hospital; Maryland General Hospital; Greater
Baltimore Medical Center; The Lutheran
Hospital of Maryland, Appellants,
v.
NATIONAL BENEFIT FUND FOR HOSPITAL & HEALTH CARE EMPLOYEES,
Henry Nicholas, Fund Trustee, et al., Appellees.
 No. 81-1837.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 2, 1982.
Decided Dec. 15, 1982.
 
 Jeffrey P. Ayers, Baltimore, Md. (Lawrence S. Wescott, Peter E. Keith, Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellants The John Hopkins Hosp., Maryland Gen. Hosp. and Greater Baltimore Medical Center.
 Leonard E. Cohen, Baltimore, Md. (Jeffrey Rockman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for appellant Sinai Hosp. of Baltimore, Inc.
 Robert S. Hillman, Russell H. Gardner, Wolf, Pokempner & Hillman, Baltimore, Md., on brief, for appellant The Lutheran Hosp. of Maryland.
 Stephen M. Silvestri, Baltimore, Md. (Benjamin R. Goertemiller, Semmes, Bowen & Semmes, Baltimore, Md., Donald E. Klein, Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, on brief), for appellees.
 Before RUSSELL, HALL and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 The appellants are five Baltimore, Maryland hospitals (the Hospitals). The appellees are the trust fund and its trustees[1] (the Fund) who administer a health and welfare benefits program for the Hospitals employees. The Hospitals contribute to the Fund pursuant to collective bargaining agreements with locals of the National Union of Hospital & Health Care Employees (the Union). The Fund is a national, multi-employer trust fund receiving contributions and providing benefits for approximately 91,000 employees of some 1,500 retail drug stores, hospitals and related health care institutions. The Fund was established by an "Agreement and Declaration of Trust" (Trust Agreement) in 1949, but most of the current contributing employers began participating in the Fund subsequent to that time. The Hospitals first began contributing in 1974. The Hospitals here appeal the district court's denial of an injunction restraining the Fund from increasing benefits to the Hospitals' employees effective September 1, 1981.[2] The basis of the Hospitals' request for an injunction is that the Union agreed in collective bargaining that benefits should not be increased during the life of the 1980-1982 contract. In ruling against the Hospitals, the district court concluded that the trustees and the Fund were governed by the provisions of the Trust Agreement and could not be bound by contrary provisions of the subsequent collective bargaining contracts between the Hospitals and the Union.[3] We agree and affirm.
 
 
 2
 The Fund's operations are national in scope, and it is administered along district lines. Benefits are provided to employees according to three basic plans--plans "A", "B" and "C". Plan "A" provides the greatest benefits, plan "B" lesser benefits, and plan "C" the least.[4] The Trust Agreement calls for the trustees to determine both the eligibility of employees for benefits and the level of benefits. Benefits are paid from pooled contributions, but the amount of each employer's contribution affects the trustees' choice of plan for those employees.
 
 
 3
 There are currently 40 Fund trustees--one-half are appointed by the Union and one-half by the employers. The employer trustees vote as a unit and the union trustees vote as a unit. The majority of each of the two categories of trustees determines the vote of that unit. An arbitrator decides any issue where there is disagreement. The appellant Hospitals and the Union in the Baltimore area are represented on the Board of Trustees. Two Union-appointed trustees in their capacity as Union officials were also on the negotiating team which concluded the collective bargaining agreements involved in this action.
 
 
 4
 During the 1978-1980 contract period, the Hospitals contributed 10% of their covered payrolls to the Fund, and their employees were covered under plan "B". In bargaining for the 1980-1982 contract, the Hospitals secured concessions from the Union reducing the percentage contribution to the Fund, and an agreement that benefits would remain constant. The Sinai Hospital 1980-82 contract provided for an 8% of payroll contribution level to the Fund, and stated that the hospital's payments shall be for benefits "... as provided as of 12/1/80 under plan B. No change in the level or quality of such benefits shall be made without the express written approval of the Hospital." The contracts of the other four hospitals provided for 9% contributions and also required the maintenance of plan "B" benefits. The 1980 agreements were the first wherein the Hospitals and the union agreed to a specific level of benefits. Contributions to the Fund had been a major obstacle to settling a difficult economic impasse between the Hospitals and Union and the quoted language represents one of the agreements breaking the deadlock. The Fund and its trustees, however, were not parties to the negotiations nor were they consulted before the agreement was reached.
 
 
 5
 After receiving notice of the 1980 collective bargaining agreements, the Fund notified the Hospitals in February 1981 that the Fund could and would not be bound by the parties' agreements fixing the level of benefits, because this power was reserved to the Fund by law and by the Trust Agreement.
 
 
 6
 Because there was a surplus in the national "pool" of funds, the trustees in their May 1981 meeting decided to increase benefits on a nationwide basis for many covered employees, including the employees of the appellant Hospitals. Their benefits were increased by transferring them from the "B" plan to the "A" plan, effective September 1, 1981.[5] The Hospitals objected to this action, and after the trustees persisted in implementing the increase, the Hospitals filed their complaint and application for temporary injunction in the district court. In the complaint, the Hospitals charge that the Union represented to them that a 9% contribution level was necessary to maintain class "B" benefits;[6] and further charge that the change in benefits breached the collective bargaining contracts between the Union and the Hospitals, violated the provisions of section 302(c)(5) of the Labor Management Relations Act of 1947, as amended, (LMRA),[7] and constituted tortious interference with the contractual relationship between the Hospitals and the Union.
 
 
 7
 The Hospitals contend that: (1) The Fund is a party to the collective bargaining agreements between the Hospitals and the Union because the Fund accepted contributions knowing the contractual provisions; or, alternatively, that (2) the Fund is bound to honor the contractual provisions limiting the level of benefits because the Fund is a third party beneficiary of the contract; or that (3) the benefit increase violates several provisions of the LMRA, by permitting an outside party (the Fund) to alter collective bargaining agreements, and by permitting the Union to obtain more than what is provided for by collective bargaining agreements; and that the increase also violates Sec. 302(c)(5)'s specificity requirements.
 
 
 8
 Trustees of any trust, of course, can contract and will be bound by the terms of their contracts, as long as they act within the authority granted them by the trust instrument creating the trust. See generally A. Scott, Abridgement of the Law of Trusts, Secs. 186-192; Restatement (Second) of Trusts Secs. 186-192. To that extent, the Hospitals are correct in their intimation that contract law applies to employee funds as well as to a testamentary, charitable or any other trust. The basic law governing the actions of trustees, however, is the law of trusts. Moreover, the requirements of the common law of trusts relating to employee benefit trust funds have been made more exacting by congressional action.[8] The Supreme Court made this clear in NLRB v. Amax, 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981).
 
 
 9
 The central issue in Amax was whether the employer-appointed trustee of a benefits trust fund was a management representative within the meaning of Sec. 8(b)(1)(B) of the LMRA.[9] The Court held that such a trustee was not a management representative but owed his complete fiduciary loyalty to the trust and its beneficiaries. Congress intended, said the Court, that the actions of trustees of union/management trust funds should be governed by the law of trusts, as tailored by Congress in enacting section 302(c)(5) and ERISA. The Court said:
 
 
 10
 Congress directed that union welfare funds be established as written formal trusts, and that the assets of the funds be "held in trust," and be administered "for the sole and exclusive benefit of the employees ... and their families and dependents...." 29 U.S.C. Sec. 186(c)(5). Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.
 
 
 11
 NLRB v. Amax, 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672, 680 (1981).
 
 
 12
 ....
 
 
 13
 And the legislative history of the LMRA confirms that Sec. 302(c)(5) was designed to reinforce, not to alter, the long established duties of a trustee.
 
 
 14
 Id., 453 U.S. at 330-331, 101 S.Ct. at 2794-2795, 69 L.Ed.2d at 681.
 
 
 15
 ....
 
 
 16
 Whatever may have remained implicit in Congress' view of the employee benefit fund trustee under the Act became explicit when Congress passed the Employee Retirement Income Security Act of 1974 (ERISA). ERISA essentially codified the strict fiduciary standards that a Sec. 302(c)(5) trustee must meet.
 
 
 17
 ....
 
 
 18
 Moreover, the fiduciary requirements of ERISA specifically insulate the trust from the employer's interest.
 
 
 19
 Id., 453 U.S. at 332-333, 101 S.Ct. at 2795-2796, 69 L.Ed.2d at 682.
 
 
 20
 ....
 
 
 21
 In short, the fiduciary provisions of ERISA were designed to prevent a trustee "from being put into a position where he has dual loyalties and therefore he cannot act exclusively for the benefit of a plan's participants and beneficiaries." H.R.Conf.Rep. No. 93-1280, supra, at 309.
 
 
 22
 Id., 453 U.S. at 334, 101 S.Ct. at 2796, 69 L.Ed.2d at 683.
 
 
 23
 We perceive no conflict between general principles of contract law and these specific pronouncements relating to trusts--rather, courts when faced with such contract claims, interpret rules of contract law in light of the specific purposes of the involved trust laws. There is no firmer principle in the common law of trusts than that requiring the trustees to act only in accordance with the terms of the trust. See Scott, supra, Sec. 164; Restatement (Second) of Trusts, Sec. 164. The Trust Agreement which established the Fund, and which governs the trustees' actions, requires the trustees to determine eligibility rules and benefit levels by establishing a benefit plan. Thus, the Agreement provides in pertinent part:
 
 
 24
 The Trustees shall receive, use, and apply the Fund Estate ... 2. To pay or provide for the payment of social benefits as defined in the Plan .... (Article II, Sec. 2).
 
 
 25
 "Plan" means the Benefit Plan established by the Trustees hereunder and as it may be amended from time to time. (Article I, Sec. 6).
 
 
 26
 The Trustees shall have the power to adopt actuarial tables, mortality tables and a Plan and to promulgate rules, regulations, resolutions and decisions governing the operation thereof, subject to change and amendment as they may determine from time to time, ... the Trustees shall obtain an actuarial evaluation of the costs of the Plan, and on the basis thereof establish and carry out a funding policy including the establishment and accumulation of such reserves as the Trustees determine to be necessary or advisable for the sound and efficient operation of the Benefit Plan. (Article V, Sec. 4). [Emphasis added.]
 
 
 27
 The provisions of this Agreement and Declaration of Trust may be amended at any time by an instrument in writing executed by one more than a majority of the Trustees provided, however, that no amendment shall alter the purposes of this Fund. (Article VII, Sec. 1).
 
 
 28
 The Trustees, in their names as Trustees, ... shall have the power to demand, collect, receive and hold Contributions .... (Article IV, Sec. 1).
 
 
 29
 There was no attempt during the 1980 collective bargaining session to initiate amendment of the Trust Agreement under Article VII to authorize the negotiators to fix benefit levels. Likewise, there was no attempt to have the trustees accept the agreed benefit level for the period of the negotiated contract. The Hospitals contend only that because the Fund accepted the Hospitals' post-agreement contributions, the Fund on the principle of offer and acceptance became bound by the contracts between the Hospitals and the unions. The Hospitals cite no authority, nor can they, for such a startling proposition. The authorities are clear that both the powers and obligations of the trustees are determined by the provisions of the trust. Scott, supra; Restatement (Second) of Trusts, supra.
 
 
 30
 The Hospitals also insist that when the surplus in the Fund developed in 1980-1981, it was the duty of the trustees to use the surplus to reduce the future contributions of the Hospitals. The contrary is true. The sole duty of the board of trustees was their fiduciary duty to consider the welfare of the employees. The decisions are uniform that the duties of trustees of employee trust funds are owed to employee beneficiaries of the trusts, not to the parties to the collective bargaining agreements creating or sustaining them. See Amax, supra; NLRB v. Construction & General Laborers' Union Local 1140, 577 F.2d 16, 20 n. 6 (8th Cir.1978), cert. denied, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979); Toensing v. Brown, 528 F.2d 69 (9th Cir.1975); Miniard v. Lewis, 387 F.2d 864, 865 n. 5 (D.C.Cir.1967), cert. denied, 393 U.S. 873, 89 S.Ct. 166, 21 L.Ed.2d 144 (1968); Talarico v. United Furniture Workers Pension Fund A, 479 F.Supp. 1072 (D.Neb.1979); Huge v. Overly, 445 F.Supp. 946, 947 (W.D.Pa.1978); Zaucha v. Polar Water Co., 444 F.Supp. 602, 606 (W.D.Pa.1978); Hurd v. Hutnik, 419 F.Supp. 630, 656 (D.N.J.1976); Teamsters Local Union v. Mizerany Warehouse, Inc., 413 F.Supp. 911 (E.D.Mo.1974).
 
 
 31
 Parties to a collective bargaining agreement can of course affect in different ways the level of benefits to be received by employees. Normally, an employer is bound to contribute a specific amount to a trust fund for a stated term--in the instant case, 8% and 9% for the period 1980-1982. There is nothing except considerations of employee relations to prevent the Hospitals, when their agreements expire in December 1982, from reducing their contributions to or withdrawing entirely from future participation in the National Benefit Fund. Future benefits necessarily would be reduced by such a withdrawal or by a valid agreement limiting contributions. Trustees of this or any other fund can only provide benefits from funds available to them. Labor-management contracting parties, however, cannot control expenditures from funds already vested in a trust entity where the trust instrument reposes that authority solely with the trustees. Likewise, neither an employer nor a union, singly or together, can alter the terms of a trust instrument such as the one involved in this case unless the power to do so was reserved when the trust was created or properly amended. See NLRB v. Driver Salesmen, etc., 670 F.2d 855 (9th Cir.1982).
 
 
 32
 The Hospitals urge that the Supreme Court's recent decision in United Mine Workers, etc. v. Robinson and Hager, --- U.S. ----, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), supports their position that bargaining parties may control the level of benefits paid from an existing employee trust fund. The Hospitals have misconstrued that decision. Although the Court's decision in Robinson illustrates one method by which the parties to a collective bargaining agreement may permissibly control the level of benefits paid by an employee benefit fund, conversely Robinson also demonstrates that the level of benefits cannot be affected by actions such as those taken by the Hospitals and the Union in the case sub judice. The union and employers in Robinson in 1974 dismantled the pre-1974 trust funds which had left the benefit levels to the trustees' discretion, and created new trusts by whose terms any change in benefit levels required the approval of the employers and the unions. Robinson, --- U.S. at ----, 102 S.Ct. at 1229 n. 2, 1233 n. 13. The Court's ruling was that there was no federal rule of reasonableness limiting the type of benefit level-setting provision inserted in original trust agreements by the bargaining parties. This is consistent with the trust-law principle that settlors generally are uninhibited in crafting original trust instruments or permitted amendments. See Scott, supra, Secs. 59, 331; Restatement (Second) of Trusts Secs. 59, 331.
 
 
 33
 The power and duty to determine the benefits to be provided by the Fund is granted to the trustees in the case sub judice by Articles I and V of the Trust Agreement. The Hospitals knew this at the time of each of their collective bargaining agreements from 1974 to 1980, when they agreed to contribute to and subscribe to the Fund. The obligations of the trustees to the beneficiaries of the trust are to be interpreted in accordance with the terms of the trust and it is clear from a reading of the entire trust instrument that the trustees' May 1981 action raising the benefit levels was consistent with their obligations.
 
 
 34
 The Hospitals contend that the trustees nevertheless are bound by the collective bargaining agreements fixing the level of benefits because the Fund is a third party beneficiary to those agreements. The Hospitals reason that because the Fund can enforce provisions of the agreements requiring the Hospitals to contribute, the trustees are bound by all the provisions of the contracts between the Hospitals and the Union. We cannot agree and hold that while the trustees as representatives of the Fund are indeed third party beneficiaries of the collective bargaining contracts, they were not parties to the contracts in the sense that they are held to have agreed in absentia to all of the contracts' provisions.
 
 
 35
 It is true that the trustees of an employee benefit fund, like the trustees of most trust groups, may enforce collections of contributions under the terms of the agreement creating the trust. The trustees here have specific authority under the Trust Agreement to collect contributions; moreover, absent this specific authority, the Fund would still be empowered as a third party beneficiary to compel payment by legal action. See Lewis v. Lowry, 295 F.2d 197 (4th Cir.1961), cert. denied, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962); Trustees v. Constant Care Community Health Center, Inc., 669 F.2d 213 (4th Cir.1982). To say, however, that by accepting or collecting such contributions the trustees are bound by all of the terms of the collective bargaining agreement would be to completely dissipate the law of trusts, leaving employee benefit funds vulnerable to the recurring whims of employer/union bargainers. One of the principal purposes of both Sec. 302(c)(5) and ERISA was to avoid just such an effect. Amax, supra.
 
 
 36
 There is likewise no merit to the Hospitals' argument that the failure of the district court to enforce the level-fixing provisions of the collective bargaining agreements permits avoidance of the specificity requirements of Sec. 302(c)(5)(B)[10] of the LMRA. The Hospitals have subscribed to the Fund since 1974 and there is no question but that the Trust Agreement describes in great detail the basis on which payments to beneficiaries are to be made. This satisfies the specificity requirement of section 302(c)(5)(B), see Landy Packing Co. v. Amalgamated Meat Cutters, 471 F.Supp. 1218 (D.Minn.1979). To hold otherwise would require collective bargaining agreements to duplicate in detail the language of trust instruments governing the administration of employee benefit funds.
 
 
 37
 We are in full agreement with the reasoning of the district court and its judgment is affirmed.
 
 
 38
 AFFIRMED.
 
 DONALD RUSSELL, Circuit Judge, dissenting:
 
 39
 I dissent.
 
 
 40
 My difference with the majority opinion arises out of its failure to give proper consideration, I respectfully suggest, to impartial facts in the background of this controversy, particularly as they relate to the actual relationship, as evidenced by conduct over a number of years, between the Union and the Fund.[1] To provide this background requires some elaboration of the facts as detailed in the majority opinion.
 
 
 41
 First, it is necessary to note the nature and purpose of the defendant Fund, the trustees of which the majority assumes to be impartial between the parties and independent of influence from either. The sole business of the Fund is the administration of the health funds contributed by the employers having collective bargaining agreements with the defendant Unions.[2] As the majority states, the Fund is ostensibly managed by a group of trustees, one-half of whom are named by the National Union and the other half by the employers selected from five geographically designated groups including the Baltimore-Washington area. The active executive director of the Fund, however, was for many years the executive vice-president of the National Union and the chairman of the board of trustees of the Fund was the president of the National Union. After a hearing involving the parties to this proceeding, the National Labor Relations Board summarized the intimate relationship in operations that existed between the Union and the Fund:
 
 
 42
 "The Fund is a tenant of, and is located in, the same building as Respondent National. Both entities have the same telephone number and employ the same accountants and data processing firm. The Fund acts as a collection agent for Respondent National with regard to dues, fees, and employer pension payments, and handles these matters in a separate department which is headed by a Fund-paid employee and staffed by three or four Fund employees and 'union employees.' "[3]
 
 
 43
 Under the collective bargaining agreements negotiated between the Union and the employers, there was a fixed percentage of the overall payroll of all employers in the bargaining unit which was paid as a contribution to finance the health benefits payable over the life of the bargaining agreement to the employees for whom the Union was bargaining. The amount of these contributions was negotiated on an actuarial basis, calculated on past experience, of the amount required to meet the benefit payments to employees actuarially to be expected under the plan of benefits adopted for the contract period for the individual employer. Prior to 1975 the Fund had a uniform plan of benefits, but in that year the Fund began to use three separate plans designated respectively as Plan A, Plan B, and Plan C. Manifestly, this meant that the contributions of each employer would vary on the basis of its individual loss experience, and the plan of benefits agreed upon by the parties analyzed actuarially. In carrying out this plan, the contributions of employers ranged between 7 1/2 percent and 10 percent.
 
 
 44
 These contributions to the Fund represented a substantial part of an employer's wage costs and represented a bargainable issue between the parties. For hospitals, such as the plaintiffs, wage costs represent often the major operating costs and, in view of the disturbing rise in hospital costs, hospitals are vitally concerned to avoid increases in such contributions. It was but natural, therefore, that the contributions to the Fund should have been an important bargaining issue between the Hospitals in this case and the Union in negotiating at two-year intervals new collective bargaining agreements, and the record abundantly establishes that this was the experience of the parties.
 
 
 45
 In the contract negotiations over the contributions to the Fund, however, the Hospitals were handicapped from the beginning by any access to the records of payments made by the Fund to their employees under the plan of benefits used in calculating the contribution. However, the Union consistently argued for an increase in such contributions at each contract renewal, claiming always that an increase was required actuarially to meet the benefit claims of the employees of the Hospital under Plan B. It was implicit in this representation of the Union that it had obtained full information from the Fund on the costs of the planned benefits. In connection with the negotiation of the 1976-78 contract, for instance, the Union demanded of the plaintiff Sinai Hospital an increase in the contribution rate from 8 1/2 to 10 percent, "claiming such was necessary because New York hospitals were subsidizing Baltimore hospitals." Sinai agreed to the increase "conditioned on being furnished with periodic experience reports showing its contributions to the Fund and the amounts paid on behalf of its employees." After a strike these were substantially the terms of the final settlement.
 
 
 46
 The experience reports, which the Fund furnished as the benefits paid the Hospitals' employees during the contract for 1976-78 were considerably less than the contributions required of the Hospital under the contract. Accordingly, in advance of the negotiation of the 1978-80 contract the Sinai Hospital requested from the fund "that it be furnished with certain [additional] contribution-related information," relevant to the negotiation. Taylor, the executive director of the Fund and the executive vice-president of the Union, refused to provide the information. When queried later at a Board hearing on his authority or reason for refusing the request, Taylor plead the "confidentiality" of such information but "gave no reason for claiming confidentiality other than stating that such was his opinion and, when asked on what authority he based his refusal to furnish the information, stated that 'my authority is broad and general and I felt that this matter was within the jurisdiction of my authority.' "[4] Further requests were made without avail. Finally, when the request was submitted to the trustees of the Fund, the management trustees voted to provide the information; but, as Davis, the Union president put it, "The Union Trustees recommend and urge" defeat of the issue. The Union trustees accordingly voted to deny the information.
 
 
 47
 Thus stalemated in its effort to secure the information, Sinai filed charges of unfair labor practices against the Union on September 22, 1978, with the National Labor Relations Board. The issue, however, remained in dispute with the Union continuing to claim that "the increased contribution rates sought were necessitated by the rate manual adopted by the Fund's trustees," even though it was already known that Sinai was making excessive contributions in order to fund payments under Plan B. When the Hospitals were checkmated in their legitimate request for the additional information relevant to collective bargaining on the contribution rate, the Hospitals capitulated and the parties finally reached agreement on a new contract which did not increase Sinai's rate of contribution and included a provision that benefits under the plan should be such "as the Trustees of the Fund may from time to time determine." In the meantime, the proceedings before the Board continued.
 
 
 48
 Before actual negotiations on the 1980-82 contract began, the National Labor Relations Board had filed its decision in the proceedings against the Union on the charges of the Hospitals. In this decision, the Board agreed with the finding of the Administrative Law Judge "that the requested information was relevant and necessary to enable Hospital to perform its collective-bargaining functions; that Taylor, in his role as executive director of the Fund, did not have a legitimate business justification for refusing to furnish it; and that his responses to the requests were not made in good faith." It, also, found that the record "raise[d] a clear inference, and we draw it, that Taylor was speaking with a union voice while wearing his fiduciary hat, and that he was not acting solely in the interests of the employee participants and their beneficiaries, whose benefits ultimately depend on freely and fairly negotiated contributions from the employers, but rather was acting to support the interests of the Unions," and, finally, that Taylor's actions were "inimical to the interests of the beneficiaries in that it undermined the good-faith bargaining on which the employer contributions providing the benefits depend." (Italics added) The Administrative Law Judge, however, had found that, since Taylor and Davis had acted "in their Fund-related capacities only" and since neither the Fund nor its trustees were to be treated as "labor organizations or partisan agents of a particular principal," the Board was without jurisdiction. This conclusion of the Administrative Law Judge was disapproved by the Board which ordered the Union to request the Fund to provide the requested information under the sanction that a failure to provide such would relieve Sinai of any obligation to bargain with the Union. This decision was filed on March 25, 1980 [248 NLRB 631]. When the Union failed to comply, the Board applied for enforcement of its order by this Court.
 
 
 49
 In the negotiation of the 1980-82 contract carried on while the enforcement proceedings involving the Board decision were pending in this Court, the major issue seems again to have been the rate of contribution to the Fund. There was apparently never any dispute between the parties on the Plan which was to control the range of benefits; this was understood always to be the Fund's Plan B. The Union negotiators, two of whom were Fund trustees, pressed the point that the Fund could not provide Plan B level benefits for a contribution rate less than 9.6 percent. The Hospitals apparently resisted this demand. A strike ensued. Finally, four of the plaintiff-hospitals agreed on a new contract providing for a 9 percent contribution, such contribution to "be used by the Trustees of the Fund for the purpose of providing said employees with health, medical, hospitalization and life insurance benefits and will remain at the levels of benefits provided as of November 30, 1980 under the Fund's Plan B." (Italics added). The plaintiff Sinai agreed only to an 8 percent contribution in its contract for the new term and added to the language in the contracts with the other Hospitals this language: "No change in the level or quality of such benefits shall be made without the express written approval of the Hospital."
 
 
 50
 The petition of the Board for enforcement of its order was argued before us on April 9, 1981. Our opinion made it clear the Union and the Fund would be forced to supply the Hospitals with the relevant material to test the Union's claim of the actuarial necessity under Plan B to have a contribution rate of 9.6 percent. In this situation, the trustees of the Fund decided unilaterally in May, 1981, to grant an increase in benefits for the Hospitals' employees to Plan A. This change, made without the knowledge of the Hospitals, was stated by the trustees to be possible because they had discovered suddenly after our decision requiring disclosure of information on costs that the contributions were more than sufficient to fund Plan B and were adequate to fund the more expensive Plan A. When they learned of the change, the Hospitals promptly objected to the unilateral change in the planned benefits. The Fund insisted it had a right to make the change unilaterally. The Hospitals then filed this action for an injunction.
 
 
 51
 In their complaint the Hospitals charged that the change was a breach of the express provisions of the collective bargaining agreement under which the contributions were made, that the Union had misrepresented the contribution rate actuarially needed to fund Plan B benefits, and that the unilateral change interfered with the collective bargaining process. The Hospitals sought of the District Court a temporary injunction. After a hearing the District Court denied injunctive relief, holding that the Fund was not bound by the provisions of the collective bargaining agreements. This appeal followed.
 
 
 52
 In reaching its challenged ruling denying injunctive relief, the District Court held that the Fund is "a distinct entity separate from both the national and local union" and that "the terms and conditions contained in the collective bargaining agreements are not binding on the Fund" which "was not itself a party to" such agreements. It accordingly concluded that "the trustees of the Fund are free to alter the level of benefits as they see fit," and may not be enjoined from amending the level of benefits.
 
 
 53
 It may be conceded that the Fund is not "a party"--at least, not a formal party--to the collective bargaining agreements between the Hospitals and the Union. But the statement that the Fund was "a distinct entity separate from both the national and local unions" is an overbroad characterization of the peculiar relationship between the Fund and the Union. The Fund, as we have seen, had no business other than that of servicing that provision of the collective bargaining agreements dealing with health benefits. All of its income was derived from payments required to be made under the terms of the collective bargaining agreements. And the Fund's rights to derive such payments depend wholly on the provisions of the separate collective bargaining agreements, which provided for different levels of contribution based on the agreed Plan of benefits, and could only be demanded by the Fund under those provisions. So much we held in Lewis v. Lowry, 295 F.2d 197, 199 (4th Cir.), cert. denied, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962). The Fund is thus in effect the creature of the collective bargaining agreements and exists solely to carry out the provisions of that and other similar agreements. To say that it is independent of the collective bargaining agreements is to disregard reality.
 
 
 54
 The District Court did rule somewhat inconsistently, and the majority seems to agree with the District Court in this, that the collective bargaining agreements did bind the Hospital to make the agreed contributions to the Fund but that those agreements which provided those payments and plainly declared how and only how they were used could not bind the Fund in its disbursement of those contributions because of a provision in the Trust Indenture creating the Fund.[5] The ruling below thus was that payments made to the Fund for a purpose clearly declared and known to the Fund and to be disbursed solely as stated in the collective bargaining agreements could be distributed, as the trustees of the Fund might determine, in complete disregard of that clearly declared manner of disbursement, as stated in the collective bargaining agreement which was the source of the funds.
 
 
 55
 The ruling that the Fund was in no way bound by the provisions of the collective bargaining agreements, was rested on the assumption that the Trust Indenture under which the Fund operated vested in the trustees of the Fund a complete discretion irrespective of any limitation that might be placed on the use of the contributions in the collective bargaining agreements under which the contributions were made, and that such discretion of the trustees overrode and superseded any provision of the collective bargaining agreement itself. As a basis for such assumption, the Fund relies on Article II, of the Trust Indenture, which, in stating "the purpose" of the Fund, said that its funds should not be used:
 
 
 56
 "To pay or provide for the payment of social benefits as defined in the Plan by means of self-insurance therefor or by means of obtaining such insurance with insurance carriers as the Trustees shall determine, including such benefits as: death benefits, accidental death and dismemberment benefits, disability benefits, hospitalization, surgical and medical benefits, college, camp and other similar benefits."
 
 
 57
 I do not construe these provisions as vesting in the Fund complete discretion to disregard the terms and provisions of the collective bargaining agreement. It is the duty of the court in this instance in any event to construe the provisions of the collective bargaining agreement and the Trust Indenture together and only if there be found a fundamental inconsistency between the two should there be a disregard of the terms of the collective bargaining agreement. As a matter of fact, the collective bargaining agreement should perhaps be given the greater weight in this construction because it is the source of the very funds to which the Trust owes its existence. The quoted language in the Trust Indenture is certainly no express statement of a right in the trustees of the Fund to act contrary to the terms of the collective bargaining agreements. Such language, on the contrary, I suggest is perfectly consistent with the conclusion that, so far as contributions and the benefit Plan, whether it be A or B, is a matter to be bargained between the Unions and the Hospitals. Whatever is agreed upon in that establishes the Fund's duties, and, so long as the Fund conforms with the terms under which the contributions are made in the payment of benefits, it has discharged faithfully its trust. It is, I submit, unreasonable to find that such provisions in the bargaining agreement interfered with the right of the Fund to be impartial and independent between the parties. I repeat: The Fund is impartial and independent when it obeys the precise terms of the bargaining contract made by the parties themselves. It ceases to be impartial when it departs from that bargaining agreement.
 
 
 58
 This is not a case, I would emphasize, when one party to the bargaining agreement is attempting to influence how the contributions paid to the Fund are to be invested or the reserve of the Fund dealt with. These are matters to be handled by the Fund without hindrance or influence from either party to the bargaining contract. But this isn't that kind of a case. The issue here is whether a Fund created to service certain provisions of the collective bargaining agreement may, in turn, frustrate the bargaining process and, in effect, write a new provision of the bargaining agreement to favor the position of one of the parties to the agreement. I find no such power or authority in the Fund either in the Trust Indenture or in general trust principles. I may add, too that I do not see how the collective bargaining agreement may be used to require the Hospitals to make the contribution but may not be used to compel the Fund, when it receives those contributions under the agreement, to disburse them in the very manner provided in the collective bargaining agreement. In fact, to hold otherwise would be to render ineffective the whole process of collective bargaining of health benefits between the employers and the Unions. Since in their opinion Plan B provides fair benefits to their employees, the Hospitals have sought to fix their level of benefits by the terms of that Plan and to limit their costs by way of contributions by the demand for financing those benefits on an annualized basis. Were this not so the Hospitals would not have argued so long and so vigorously over the Plan to be funded.
 
 
 59
 In offering this suggestion, the Union would disregard a compelling consideration, unnoticed by the District Court too, but adverted to by the Board in its decision. This consideration was tied in to the fact that any action by the Union which departed from its bargaining obligation was "inimical to the interests of the beneficiaries in that it undermined the good-faith bargaining on which the employer contributions providing the benefits depend." 248 NLRB at 633. Those are the public interests involved here. Unless the terms of the collective bargaining agreement are observed, the whole process of collective bargaining will be prejudiced.
 
 
 60
 Finally, I question whether, based on the background of this controversy as detailed in the findings of the National Labor Relations Board in its decision as earlier summarized by me, the Fund is to be treated as having acted in perfect good-faith between the parties in this matter. It has uniformly sided with the Union in attempting to deny to the Hospitals information essential to intelligent collective bargaining. Thus, the Board found that the Fund's responsible officers had not in the past, for instance, acted in some instances in "good-faith" in denying to the Hospitals access to relevant information which should have been made fully available to them, and they did this unquestionably at the instance of the Union. The Fund's sudden and unexplained discovery that contributions received by it under the collective bargaining agreements with the Hospitals were sufficiently excessive to finance much greater benefits, despite professions by the Union to the contrary, which professions were made, it seems fair to infer with the Fund's knowledge, suggests indisputably that there was cooperation between the Fund and the Union in order to frustrate the Hospitals' contractual provision limiting expressly the level of benefits to be funded.
 
 
 61
 In my opinion, fair dealing and simple justice demand that the Fund comply with the terms of the collective bargaining agreements, of which it was a creature and under which it derives the funds it disburses. For that reason, I dissent.
 
 
 
 [1]
 Also defendants in the action below were the National Union of Hospital and Health Care Employees and District Local 1199E of that union, but the union takes no position in this appeal
 
 
 [2]
 The Hospitals' complaint also included claims of misrepresentation by the Union during bargaining negotiations, but the court did not rule on those claims
 
 
 [3]
 The Hospitals' application for a stay of the proposed benefit increase pending appeal was denied by the district court and by a panel of this court
 
 
 [4]
 Currently there are 62,000 employees covered under Plan "A", 28,000 under Plan "B" and 700 under Plan "C"
 
 
 [5]
 The actual benefits provided under each plan were also improved
 
 
 [6]
 The district court granted the Hospitals time to amend their complaint to allege that certain trustees were party to the misrepresentation during negotiations, but the record on appeal does not show that the complaint had been amended at the time of appeal. The issue involving alleged misrepresentation by the Union was still pending in the district court at the time of this appeal
 
 
 [7]
 Section 302(c)(5), 29 U.S.C. Sec. 186(c)(5), permits employer payments
 to a trust fund established by such [employee] representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities;....
 
 
 [8]
 Section 302(c)(5), Labor Management Relations Act of 1947, 29 U.S.C. Sec. 186(c)(5); Employee Retirement Income Security Act of 1974 (ERISA), including Multi-Employer Pension Plan Amendments of 1980, 29 U.S.C. Sec. 1001, et seq
 
 
 [9]
 29 U.S.C. Sec. 158(b)(1)(B)
 
 
 [10]
 Quoted supra at note 7
 
 
 [1]
 I use the term "Union" to include the National and Local Unions and the "Fund" to describe the trustees of the health benefit program
 
 
 [2]
 For this and later statements of the earlier negotiations between the parties prior to the 1980-82 contract and of the relationship between the Union and the Fund see National Union of Hospital and Health Care Employees, etc. and Sinai Hospital of Baltimore, Inc., 248 NLRB 631 (1980)
 
 
 [3]
 National Union, etc. and Sinai Hospital of Baltimore, Inc., 248 NLRB at 631
 
 
 [4]
 This language is taken from the National Labor Relations Board decision, 248 NLRB at 632
 
 
 [5]
 This was exactly the position of the Fund. Thus, the executive director of the Fund, in a letter of July 2, 1981, to Sinai Hospital, first reiterated that the Fund was disregarding the provision of the collective bargaining agreement which fixed the benefits available as those under Plan B and expressly provided that there could be no change in or departure from that Plan without the written consent of the Hospital and then demanded the payment to the Fund as provided under the very terms of the collective bargaining contract which limited the use of the contributions to meeting the benefit requirements under Plan B. In effect, it demanded the rights under the collective bargaining agreement that bound the Hospital but asserted the right to disregard the collective bargaining agreement to such extent as that agreement limited its action in the use of the Hospital's contributions. Under this theory the collective bargaining agreement is enforceable when it binds the Hospital and benefits the Fund but is non-enforceable and a nullity when it binds the Fund itself when the latter's very existence and operations depend on the collective bargaining agreement