Bill PIERCE et al.

v.

NECA–IBEW WELFARE TRUST FUND.

No. CIV–1–77–21.

United States District Court,
E. D. Tennessee, S. D.

April 6, 1978.

S. Del Fuston, Chattanooga, Tenn., for plaintiffs.

Hugh J. McCarthy, Chicago, Ill., Duggan, McDonald & Hawley, Chattanooga, Tenn., for defendant.

## MEMORANDUM OPINION

FRANK W. WILSON, Chief Judge.

This is an action for declaratory and injunctive relief arising out of alleged viola-

tion of fiduciary duties with regard to the administration of a welfare trust fund. The plaintiffs allege that by denying them certain benefits under the welfare trust fund the defendant violated the following statutes: 1) Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186; and 2) the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The parties having waived trial by jury, the lawsuit was tried before the Court sitting without a jury. The Court now enters the following findings of fact and conclusions of law based upon the full record in the lawsuit.

Before considering the case on its merits, the Court notes that the plaintiffs have moved to amend their complaint. It appearing that the proposed amendments would serve to clarify the plaintiffs' position and would work no hardship or disadvantage upon the defendant and for good cause shown, the motion to amend will be granted.

This lawsuit having arisen under 29 U.S.C. § 186 and 29 U.S.C. §§ 1001 et seq., the Court has jurisdiction over the action pursuant to 29 U.S.C. § 186(e) and 29 U.S.C. § 1132(e)(1).

This case arises out of a dispute over the administration of a welfare trust fund, the NECA–IBEW Welfare Trust Fund, the home office of which is located in Decatur, Illinois, and which will be referred to herein as the "Decatur Trust" or the "Decatur Fund". The Decatur Trust generally provides money for hospitalization and other medical expenses of its participants as well as other benefits (See Ex. # 8).

The Decatur Fund is a multiemployer-multiunion pooled trust fund. A "multiemployer" fund is one to which several employers contribute. Multiemployer funds are typically created pursuant to a master contract negotiated by a local union with a group of employers under which the employers are required to contribute to a fund established for the benefit of their qualified employees. A "multiemployer-multiunion" fund results from employers from several such bargaining units (sometimes referred to as "wage area groups") contributing to a single centralized welfare trust fund. As a multiemployer-multiunion fund the Decatur Fund exists for the benefit of more than seventeen thousand (17,000) employees of contributing employers. It is self-insured for all benefits and must pay all claims out of its income and reserves. The Fund is administered by a Board of Trustees composed of employer and union representatives and is governed by an Agreement and Declaration of Trust ("Agreement"). The trustees are required by the Agreement to promulgate eligibility rules for participation in the Fund. The Fund is a proper defendant in this lawsuit by virtue of 29 U.S.C. § 1132(d)(1).

The named plaintiffs in the present action were each participants in the Decatur Fund for some time between July 1, 1971 and December 31, 1976. During that same period, the named plaintiffs were also members of Local 175 of the International Brotherhood of Electrical Workers ("Union" or "Local 175"). Local 175 has its offices in Chattanooga, Tennessee. This case has been certified as a class action in conformance with Rule 23 of the Federal Rules of Civil Procedure. Accordingly, the named plaintiffs bring this lawsuit in their own behalf and in behalf of all participants of the Decatur Trust who are in the jurisdiction of Local 175, there being a total of 265 participants within the class. Appropriate class action notice having been given the Local 175 participants, only one, Jackman D. Creech, Jr., elected to opt out of the class.

The plaintiffs' participation in the Decatur Trust appears to have come about as a result of a 1970 contract between the Union and the association of electrical contractor employers in the Chattanooga, Tennessee area. That association is known as the East Tennessee Chapter, Chattanooga Division, NECA, Inc. ("Chattanooga NECA") and is affiliated with the National Electrical Contractors Association ("NECA"). The 1970 contract provided that employers would make contributions to a health and welfare plan for the benefit of their employees. In

562

compliance with the contract, the Union and Chattanooga NECA established a welfare trust fund entitled the NECA–IBEW 175 Welfare Fund ("175 Fund"). The 175 Fund accumulated employer contributions until July 1, 1971 at which time the trustees thereof decided to affiliate the participants of the 175 Fund with the Decatur Trust. Consequently, on July 1, 1971 former participants in the NECA–IBEW Welfare Fund became participants in the Decatur Trust. At the time that Local 175 joined the Decatur Fund the following provision regarding the trustees' right to make changes in the benefit and eligibility requirements was a part of the plan document:

"This document will be the sole document used in determining benefits to which covered individuals are eligible and may be amended from time to time by the trustees to reflect changes in benefits or eligibility requirements." (Ex. # 5, p. 5).

A similar provision was contained in the Decatur Fund Trust Agreements or Plan Documents at all times relevant to the issues in this lawsuit.

From July 1, 1971 until December 31, 1976 Chattanooga NECA employers contributed to the Decatur Fund. By agreement between Chattanooga NECA and Local 175, the parties elected to leave the Decatur Fund and enter another fund and the employees stopped contributing to the Decatur Fund on December 31 1976. According to the terms of the Agreement and Declaration of Trust of the Decatur Fund, as in force upon December 31, 1976, participants whose employers ceased contributing to the Fund would continue to receive benefits from the Fund but only for thirty-one days following the final employer contribution. Accordingly, benefits under the Trust were terminated for members of Local 175 on January 31, 1977.

At the time the Local 175 joined the Decatur Fund in 1971 and at all times thereafter until January 15, 1976, the Trust Agreement under which the Plan operated provided that employee benefits would terminate for any participating employees either three, six or nine months after the

employer ceased making contributions on behalf of the employee, the benefit termination date being determined by the number of hours worked by the employee in preceding quarters and for which contributions had been made to the Fund. For purposes of clarity and brevity, this period of continuing eligibility for benefits is often referred to in the record as "extended benefits" or "extended coverage". It is the Decatur Fund Trustees' action on January 15, 1976 in reducing this "extended liability" to a period of 31 days that forms the crux of this lawsuit. On January 15, 1976, the Board of Trustees amended the Plan, effective January 1, 1976, to add the following provision at Article I, Section 4E:

"In the event that a collective bargaining agreement requiring contributions to the Welfare Fund is not succeeded by a collective bargaining agreement requiring contributions to the Welfare Fund, then a Participating Employer which is no longer obligated under the terms of a collective bargaining agreement to make contributions to the Welfare Fund shall cease being a Participating Employer on the date that the obligation terminates, and its employees shall not be Eligible Employees as to any claims incurred on or after the thirty-first calendar day following the date on which the obligation to contribute terminated."

The effect of this amendment was to reduce to 31 days the period of time during which some of the plaintiffs were eligible to receive benefits from the Trust following the termination of payments to the Fund upon their behalf by their employer (Ex. # 4).

This change in the extended benefits was noted in the July 1, 1976 edition of the "Summary Plan Description" distributed to plan participants (Ex. # 8, p. 23). The Fund has continued to pay all claims filed by Local 175 members for benefits due or losses incurred prior to January 31, 1977. Although the record is not clear that any particular union member sustained any particular financial loss as a result of the change in the Plan, the case was practiced upon the assumption that there were such financial losses.

The present lawsuit arises out of the adoption of Article I, Section 4E. The plaintiffs allege, and the defendants deny, that by so amending the Agreement, the trustees of the Decatur Fund violated both Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186 and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* It is necessary, therefore, for the court to consider the events surrounding adoption of the amendment.

As a multi employer-multi union pooled trust fund, the Decatur Trust included participants from several local unions. One such local was Local No. 176, IBEW, of Joliet, Illinois ("Local 176"). On June 1, 1975 Local 176 withdrew from the Decatur Trust. As a result of that withdrawal and as a result of the Fund's continuing obligation to pay extended benefits for a period of three, six or nine months to the members of the Joliet Local after withdrawal of that local from the Fund, the Fund was required to pay some $700,000 in such extended benefits. Prior to that time the Fund had paid benefits from current revenues, no reserves having been established to pay these "extended benefits". The Trust's consultant, Mr. Richard Bloomquist of the firm of R. N. Bloomquist and Company, became concerned about the effect of possible future withdrawals upon the financial condition of the Trust. Mr. Bloomquist also became concerned about the effect of certain accounting guidelines (which were promulgated by the American Institute of Certified Public Accountants) upon the liabilities of the Trust. Accordingly, Mr. Bloomquist examined the effects that withdrawals of other locals might have upon the Fund in order to make recommendations for action to the Board.

Mr. Bloomquist reported his findings to the Board at its January 15, 1976 meeting in Atlanta, Georgia. At that meeting Mr. Bloomquist, together with the Fund attorney, Mr. Hugh McCarthy, recommended adoption of an amendment to the Agreement and Declaration of Trust which became Article I, Section 4E. Mr. McCarthy reported that as of January 1, 1976 the Fund's liabilities resulting from "eligibility earned by employees" totalled approximately $7,600,000 (Minutes of January 15, 1976 NECA–IBEW Welfare Trust Fund Board of Trustees, p. 3). Mr. McCarthy further reported that after the withdrawal of Local 176 and the concomitant cessation of Local 176's employers' contributions, the Fund made payments of approximately $700,000 to Local 176 members. Mr. Bloomquist reported that similar future payments would be greatly reduced if the proposed amendment were adopted. By way of example he stated that upon adoption of the amendment, the Fund's liability to the members of a hypothetical 500-member terminated local would be reduced from $232,500 to $26,000 (*Id.* at p. 4). Upon the additional recommendation of the Trustees' Steering Committee and upon motion by that Committee's chairman, the trustees adopted the amendment. A representative of Local 175 participated as a Fund Trustee at this meeting.

Upon this state of the record the plaintiffs contend that the trustees' action on January 15, 1976 in purporting to reduce the extended liability benefits due under the Plan from three, six or nine months to only 31 days was unlawful and a breach of their fiduciary duties in that (1) the right to such extended benefits "accrued" or "vested" in those union members who had worked the prerequisite number of hours in the quarters prior to withdrawal of the Union from the Plan on December 31, 1976 and such rights could not lawfully be divested by the trustees; (2) the trustees were derelict in their duties in failing to accumulate reserves so as to "fund" the extended liability coverage, thereby creating the conditions which induced the adoption of the 31-day resolution; and (3) the trustees failed to give adequate notice of the 31-day resolution in that they purported to make it effective upon adoption rather than making the resolution effective only after the expiration of all "accrued" or "vested" rights and in that they failed to give notice of adoption of the resolution to each plan participant. The defendants dispute each of the foregoing contentions and assert both the propriety and legality of all

actions taken by the trustees in the adoption and promulgation of the 31-day resolution.

■ As previously noted, this action is brought pursuant to both the Labor Management Relations Act (LMRA) (29 U.S.C. § 186) and the Employee Retirement Income Security Act (ERISA) (29 U.S.C. §§ 1001 et seq.). It is appropriate therefore to test the actions of the trustees herein by reference to the standards applicable under each of those acts. Under LMRA the standard of conduct required of trustees of welfare and pension funds is that they not act in an "arbitrary and capricious" manner in the administration of the trust. *Local Union No. 5, etc. v. Mahoning & Trumbull County Building Trades Welfare Fund, et al.*, 541 F.2d 636 (6th Cir. 1976); *Rehmar v. Smith*, 555 F.2d 1362, 1371 (9th Cir. 1976). Both LMRA and ERISA require that such fiduciaries manage the fund for the sole and exclusive benefit of the participants and beneficiaries. *See* 29 U.S.C. § 302 and 29 U.S.C. § 1104. Further relevant requirements of ERISA are that the trustees of such funds exercise the care and skill "that a prudent man" would exercise under like circumstances [29 U.S.C. § 1104(a)(1)(B)] and that they manage the fund in accordance with the documents governing the trust [29 U.S.C. § 1104(a)(1)(B)].

Applying these standards to the actions of the trustees in this lawsuit, the Court is of the opinion that the plaintiffs have failed to establish any grounds for judicial interference with such actions.

■ As regards the plaintiffs' contention that their right to extended benefits became "vested" upon joining the Plan, it is sufficient to note that under the terms of the trust agreement the trustees were given wide discretion in the management of the trust, including the specific authority to make changes "in benefits or eligibility requirements" (Ex. 5, p. 4). This provision was as much a part of the Plan at the time the plaintiffs became participants as was the extended benefit provision itself. Under the provisions of the Plan it cannot be said that the benefits became "vested" in the true sense of that term until a claim arose that was payable under the then current provisions of the Plan. It is undisputed in this case that all claims that arose within the 31-day period following withdrawal of the Union from the Plan were fully honored.

The evidence is quite clear that in adopting the 31-day extended benefit resolution, the trustees acted with a reasonable and appropriate concern for the financial stability of the Plan and the long-term viability of the Fund. It is equally clear that in taking such action they acted from no corrupt or improper motive but rather that they were acting for the exclusive benefit of the total membership within the Plan.

■ While the establishment of reserves for payment of benefits may well be a more sound financial practice than the payment of benefits from current revenues, the former practice is not compelled nor is the latter practice prohibited by any provision in either LMRA or ERISA. Moreover, the adopting of such a funding practice would either have compelled a reduction of the benefits payable under the Plan during the accumulation of the reserve or an increase in the payments required to fund the Plan. The balancing of such considerations was within the reasonable discretion of the trustees.

■ As regards the plaintiffs' contention that the trustees were derelict in their duties in failing to give adequate notice of the adoption of the 31-day resolution and the reduction of the benefits thereby accomplished, it is sufficient to note that the trustees' action in this regard was taken more than nine months in advance of the withdrawal of Local 175's membership from the Plan, that a representative of Local 175 was present in his capacity as a trustee of the Fund at the meeting at which the resolution was adopted, and that the substance of the resolution was contained in the July 1, 1976 edition of the "Summary Plan Description" distributed to the membership (Ex. # 8, p. 23). As to the reasonableness of this means of notification, it is sufficient to note that the Plan membership was given notice of the change in the extended benefits in the same manner as they were

originally given notice regarding extended coverage.

The Court accordingly concludes that the plaintiffs have failed to establish that the conduct of the trustees herein complained of was in violation of either LMRA or ERISA. Rather, the Court concludes that such conduct was neither arbitrary nor capricious, nor was it the conduct of an imprudent person under the circumstances here shown. The Court further concludes that such conduct was taken pursuant to law, was taken pursuant to the agreements governing the Trust, and was for the sole and exclusive benefit of the total membership in the Plan.

In conclusion it may be noted that the action of union welfare fund trustees in the adoption of a resolution quite similar to the one here involved was upheld as being lawful in the recent case of *Local Union No. 5, etc. v. Mahoning & Trumbull, etc.*, 541 F.2d 636 (6th Cir. 1976). Although the facts and circumstances in that case arose prior to the enactment of ERISA, the holding of the Sixth Circuit Court of Appeals in that case is nevertheless quite persuasive authority here.

An order will accordingly enter dismissing this lawsuit.