**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and Daniel J. Shannon**

v.

**KRAFTCO, INC., d/b/a Sealtest Foods Division.**

**KRAFT, INC.**

v.

**LOCAL UNION 327, TEAMSTERS, CHAUFFEURS, HELPERS AND TAXICAB DRIVERS.**

Nos. 78–3135, 79–3064.

United States District Court,
M.D. Tennessee,
Nashville Division.

May 9, 1984.

Cecil Branstetter, Nashville, Tenn., for plaintiff.

Terry Brooks, Nashville, Tenn., for defendant.

## MEMORANDUM

JOHN T. NIXON, District Judge.

The above-styled actions raise issues of federal labor law. Civil Action No. 78–3135 was filed April 20, 1978 by Central

States Southeast and Southwest Areas Pension Fund and its trustees (Fund) on behalf of the Fund's participants and beneficiaries seeking the payment of allegedly delinquent pension contributions from an employer, Kraftco, Inc., d/b/a Sealtest Foods Division (Kraftco). Civil Action No. 79–3064 was filed on February 6, 1979 by Kraftco against Local Union 327, Teamsters, Chauffeurs, Helpers and Taxicab Drivers (Union) under the declaratory judgment provisions of 28 U.S.C. §§ 2201 and 2202 seeking a declaration of its rights and responsibilities for pension contributions under the terms of the collective bargaining agreements with the Union. Subsequently both actions were consolidated. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332, for enforcement of trust agreements creating the Fund and to which Kraftco is a party; the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, for enforcement of rights conferred by 29 U.S.C. § 1145; and the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, for enforcement of collective bargaining agreements entered into between Kraftco and the Union.

Previously, the parties filed cross-motions for summary judgment. The Court concluded that the provisions of ERISA did not apply to the Fund's claims against Kraftco arising prior to January 1, 1975, and that the Fund's claims under the LMRA arising prior to April 20, 1972 were time-barred by TENN.CODE ANN. § 28–3–109(3). The cross-motions did not raise claims under diversity of citizenship. The motions in case No. 78–3135 were denied and the Union's motion for summary judgment in case No. 79–3064 was granted and the action dismissed. *Central States v. Kraftco*, 527 F.Supp. 420 (M.D.Tenn.1981).

Kraftco appealed the dismissal. That appel was pending on March 15, 1982 when Civil Action No. 78–3135 came on for trial without benefit of a jury. During the trial, the Court reserved both motions for dismissal under FED.R.CIV.P. 41(b) as well as a motion in limine made on behalf of Kraftco.

On June 23, 1982, subsequent to the bench trial, the Court of Appeals reversed the judgment of this Court dismissing the Union from Civil Action No. 79–3064 and remanded the matter for further proceedings not inconsistent with its opinion. *Kraftco, Inc. v. Local Union 327, Teamsters*, 683 F.2d 131 (6th Cir.1982). Thereafter, Kraftco and the Union stipulated that another hearing would adduce no further evidence relating to issues in Case No. 79–3064 and that the issues therein could be submitted for disposition on the basis of the record made on March 15, 1982. Having considered all of the evidence presented, and briefs and argument of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Plaintiff Fund is a common law trust established as an employee benefit plan as a result of negotiations between various employers, employer groups and certain Teamster local unions and conferences. It has been in existence since approximately 1957. The Fund is an employee benefit plan within the meaning of ERISA, 29 U.S.C. §§ 1001 *et seq.* and the LMRA, 29 U.S.C. §§ 141 *et seq.*

Defendant Kraftco is an employer operating a dairy production facility in Nashville, Tennessee. Defendant Union is a labor organization that has been engaged in collective bargaining with Kraftco for many years prior to this controversy. Neither Kraftco nor the Union is a signatory to the trust agreements creating the Fund. However, through collective bargaining agreements between Kraftco and the Union dating from 1966, Kraftco and the Union have agreed to participate in the Fund. The trust agreements require Kraftco to pay the Fund a specified sum per week on behalf of certain employees at an ice cream plant and a milk plant operated by Kraftco in Nashville, Tennessee.

Each collective bargaining agreement in effect between the Union and Kraftco from

1966 through 1980 contains the following paragraph relating to pension participation:

> The Employer recognizes the authority of the acting trustees and their successors, appointed by the Employer and the Union, to administer the above named Pension funds in accordance with the Trust Agreement under which such trustees have been appointed and are acting and the rules and regulations adopted by them; but Employer's obligation shall be and hereby is limited to the foregoing weekly contributions.

Prior to 1971, Kraftco and the Union negotiated contracts for three separate bargaining units: milk plant employees, ice cream production employees, and ice cream route sales employees. In 1971 the milk plant and ice cream production employees were combined into one bargaining unit. There was a higher turnover of employees in the milk plant and ice cream production operations than among the route salesmen. This resulted in a significant difference in the pension provisions of the collective bargaining agreements.

The collective bargaining agreements in effect between 1965 and November of 1968 for milk plant employees and ice cream production employees required weekly payments to the Fund from Kraftco on behalf of all employees with thirty-six months of service. The collective agreement covering the ice cream route salesmen required weekly payments to the Fund on behalf of all salesmen with ninety days of service. Thus, workers in the operation where a high rate of turnover existed, were not covered by the pension benefits until they were on the payroll for three years, whereas route salesmen, whose employment was more stable, were covered after being on the job ninety days. The 1966 collective bargaining agreements were the first for milk plant and ice cream production employees that specifically provided that pension contributions would not be paid by Kraftco on behalf of employees having less than thirty-six months seniority in the bargaining unit.

In December, 1968, Kraftco and the Union entered into a successive collective bargaining agreement for ice cream route salesmen that expired in 1971. This collective bargaining agreement carried forward the provision that weekly payments be made to the Fund by Kraftco for all salesmen with ninety days of service. During 1969, Kraftco and the Union entered into successive collective bargaining agreements for ice cream plant production employees and milk plant employees.

The by-laws of Local 327 provide that whenever a collective bargaining agreement is about to be negotiated, the president calls a meeting to determine and authorize the bargaining demands. These demands are then submitted to the employer. After the contract is executed, the agreement is submitted to the members at another meeting of the Union for vote.

Negotiations for the milk plant employees began first. Kraftco was represented by T.N. Rose, its general manager, and by Donald H. Spencer, its personnel manager. The Union was represented by Don Vestal, its president and business manager, and members of the Union negotiating committee. A representative of the Teamsters International Union was present at and participated in one session of the negotiations, even though local collective bargaining agreements do not need the International Union's approval to become effective. Due to the insistence of the International Union's representative, the thirty-six month provision was deleted from the new contract. At the bargaining table both sides agreed to the deletion of the thirty-six month provision. The new contract that was executed by both parties provided that Kraftco would make pension contributions on behalf of employees with thirty or ninety days of service, depending upon job classification. In that the contract had to be ratified by the membership of the Union, the contract was not binding at this point. The contract was executed and duly ratified on June 27, 1969.

On June 26, 1969, Rose and Spencer for Kraftco, and Vestal for the Union, met to

discuss circumventing the language of the new contract that had been insisted upon by the International Union's representative. No member of the Union negotiating committee was present. The following "side letter" agreement resulted from that meeting:

### SEALTEST FOODS
DIVISION OF NATIONAL DAIRY PRODUCTS CORPORATION
P.O. BOX 1179, 1401 CHURCH STREET, NASHVILLE, TENNESSEE, AL 5-6431

June 26, 1969

Mr. Don Vestal
President & Business Manager
Local Union 327
Teamster, Chauffeurs, Helpers & Taxi Cab Drivers
1006 Russell Street
Nashville, Tennessee

Dear Mr. Vestal:

As per our conversation of June 26, 1969, and our agreement of such time, Sealtest Foods will continue to commence regular pension payments on our employees when such employees have been in our employ for a period of thirty-six (36) months. Said pension payments shall then continue as stipulated in our present labor agreement.

If you concur in this agreement, please sign one copy and return to us.

We realize this may require some possible discussion and adjustment for some specific individuals during the life of our labor agreement.

Sincerely yours,
SEALTEST FOODS
/s/ T. H. Rose
T. H. Rose

/s/ Don Vestal
Don Vestal, Pres. & Business Mgr.
June 27, 1969
Date
/s/ D. H. Spencer

---

Although the contract executed on June 27, 1969 became effective after Union ratification, the side letter was not presented to the Union membership for ratification at that time or any subsequent time.

In the fall of 1969, Kraftco and the Union began negotiating a new collective bargaining agreement for ice cream plant employees. The new bargaining agreement for that unit also deleted the thirty-six month requirement and replaced it with the provision that Kraftco would make pension contributions to the Fund on behalf of employees with thirty or ninety days service according to job classification. After this agreement was executed and took effect, Kraftco was required to make pension contributions on behalf of all employees represented by the Union who had thirty or ninety days of service, dependent upon job classification. Again, the side letter was not presented to the Union membership for ratification.

Nonetheless, contributions to the Fund on behalf of the employees in the milk plant and the ice cream plant were made in accordance with the terms of the side letter rather than under the terms of the collective bargaining agreement. Succeeding collective bargaining agreements contained the "thirty or ninety days of service" provision, but Kraftco continued making contributions to the Fund on behalf of the ice cream plant employees and milk plant employees in accordance with the side letter. Kraftco took the position that the letter modified all of these contracts. Spencer considered the letter of infinite duration and Rose considered the letter in effect "until it changed." Not until this controversy arose in 1978 did Kraftco begin to make contributions for milk plant and ice cream plant employees as required by the

collective bargaining agreements, rather than in accordance with the terms of the side letter.

Side letters are not unknown to the labor-management relations of Kraftco and the Union. Examples of other letters were submitted into evidence. Some dealt with such routine matters as the re-employment of a former employee, leave of absence of an employee or the conditional transfer of an employee from a union line job to a non-union supervisory position. A side letter that appears to have made changes in the underlying contract without ratification was dated November 8, 1966. It reads as follows:

Nashville, Tennessee
November 8, 1966

Mr. T. H. Rose
Sealtest Foods
1401 Church Street
Nashville, Tennessee

Dear Mr. Rose:

Listed below are changes in our present contract which have been agreed to by both the Union and Sealtest Foods:

ARTICLE XXIII—SENIORITY

The last sentence of both Section A and Section B shall be changed to read as follows: "After an employee has bid on a route and been awarded such route, or a new employee has been assigned a route, such employee cannot bid on another route for a year regardless of how long he serves the new route awarded him."

It is further agreed in Article XXIII that at the end of two weeks, following the assignment of a route to a successful bidder, that said successful bidder shall be awarded such route to serve or shall begin receiving compensation based on said route.

ARTICLE XXIV—COMPENSATION

Section B. Retail Driver-Salesmen shall be changed to read as follows: "Retail driver-salesmen shall receive fifty dollars ($50.00) per month as base pay, plus fifteen and one-fourth percent (15¼%) after January 1, 1966, and fifteen and one-half (15½

%) during 1967, and fifteen and three fourths percent (15¾%) during 1968, on all collections and cash retail sales from their respective routes, except butter, eggs and ice cream sales. For butter sales retail driver-salesmen shall receive two cents (2¢) per pound, on all retail sales of butter and one cent (1¢) per lb. on all cash and credit wholesale sales of butter. Eggs and ice cream sales as to which driver-salesmen shall receive ten percent (10%) on all retail sales of eggs and ice cream products. Retail driver-salesmen, on all wholesale sales, other than butter, eggs and ice cream products, shall receive seven and one-half percent (7½%)."

ARTICLE XXIV—Section D—shall be changed by adding the following sentence to the last paragraph in said section: "The rate of pay for pudding makers shall be at the same rate of pay as cheese makers and the rate of pay for pudding filler shall be at the same rate of pay as cheese filler."

Very truly yours,
/s/ James R. Craighead
Vice President
For the Union
/s/ D. H. Spencer
For the Company

In 1971, Don Vestal was ousted from office of president and business manager on the basis of charges of corruption and finanical malpractice. A trusteeship was established. Mr. W.C. Smith was appointed trustee and he in turn employed Billy Burrows as business agent for the Union. Mr. Burrows immediately became the Union's spokesman in negotiating agreements with Kraftco. In 1974, Rose was replaced as general manager by Royce E. McClintock, who thereafter participated in all negotiations with the Union. Shortly thereafter, in 1974 or 1975, Spencer informed McClintock of the side letter agreement. However, after the ouster of Vestal in 1971 until this controversy arose in 1978, no representative of Kraftco informed the new Union leadership of the side letter.

In late 1977 or early 1978, a milk plant employee learned that contributions to the Fund on his behalf had not begun until he

had completed thirty-six months of service. The employee reported this information to Burrows, who in turn learned that the Kraftco payroll clerks were under instructions to begin making contributions to the Fund on behalf of the milk plant workers only after they had completed thirty-six months of service.

Subsequently, Kraftco agreed to make pension contributions on behalf of all employees with thirty or ninety days of service according to job classification. It is not clear from the record whether this occurred before or after the execution of another milk plant collective bargaining agreement. The question then arose as to whether Kraftco would make past due contributions based on the collective bargaining agreement language from 1969 to 1978. At this time, Kraftco officially informed the new Union leadership of the 1969 side letter.

In due course the Union informed the Fund about the controversy. During the entire period in question, Kraftco provided monthly reports to the Union and the Fund detailing on whose behalf pension contributions were being made. Neither the Union nor the Fund had audited these reports to determine if contributions on behalf of those with less than thirty-six months of service were being made. The Fund, which receives monthly contributions from 15,000 employers, did not have copies of the collective bargaining agreements. Moreover, the remittance forms used by Kraftco in submitting contributions to the Fund do not provide for service of employment date information.

The Fund was created under the law of Illinois, and at all times relevant in this case, the relevant trust agreement plans provided that "[a]ll questions or controversies, of whatsoever character ... whether as to ... any writing ... instruments or accounts ... shall be submitted to the Board of Trustees for decision, and the decision ... if made in good faith, shall be binding on all persons dealing with the Trust Fund." Article V, § 2, Pre-Trial Order Exhibits 1–4. Within two months after the Fund was informed of the controversy, its Board of Trustees instituted Civil Action No. 78–3135 to collect the allegedly past due pension contributions.

Before trial, the Trustees, pursuant to the mandate of the Trust Agreement, resolved the controversy by concluding that the side letter "probably" does not have any force, weight or effect upon pension contributions required in the collective bargaining agreement entered into in 1969 for Kraftco milk plant employees. The trustees reasoned that neither Vestal nor any other person had been authorized by the Trust Agreement to act as agent for the Fund and reduce contributions required by the collective bargaining agreements. However, all questions concerning application of the side letter were specifically referred for resolution in the instant case.

Kraftco has tendered contributions to the Fund on behalf of employees it considers to have been affected by the thirty-six month language of the side letter. It is the position of Kraftco that this is consistent with the "make whole" provision of the side letter which reads as follows: "We realize this may require some possible discussion and adjustment for some specific individuals during the life of our labor agreement."

During the pendency of this action two Kraftco employees, George Craft and Fred Howell, applied for benefits. Each had the requisite number of years of service under the terms of the Trust Agreement and the collective bargaining agreements to be eligible for retirement benefits. However, because of the thirty-six month provision of the side letter, contributions were not made to the Fund on their behalf until they had been employed for three years. The Fund credited both employees with an additional thirty-six months and Kraftco tendered to the Fund contributions on behalf of each for the thirty-six month period pursuant to the "make whole" provision of the side letter. On June 7, 1979, Kraftco tendered contributions on behalf of Craft. The Fund returned the tender. On May 20, 1981, Kraftco tendered contributions on behalf of employee Howell. On this occasion,

the Fund accepted the tender for the Kraftco account with an interest assessment.

As expected, the Fund and Kraftco disagree over whether Kraftco owes delinquent trust fund contributions under the collective bargaining agreements. Kraftco takes the position that none of its employees has been harmed by the use of the side letter and that all the Fund may lose are windfall contributions that will never be paid to beneficiaries. The Fund, on the other hand, claims that if it grants thirty-six months of contribution credit to all persons hired by Kraftco between 1969 and 1978 who apply for pension benefits, then the corpus of the Fund will be reduced. Such reduction, according to the Fund, will endanger the right of all persons to retirement benefits because the actuarial soundness of the trust fund requires that benefits not be received by persons for whom the proper contributions have not been paid.

The question before the Court, therefore, is what effect does the side letter have on the collective bargaining agreements between Kraftco and the Union. This broad question involves certain sub-issues: did the side letter have any force or effect; if so, did the side letter modify only the 1969 contract between the Union and Kraftco on behalf of the milk plant employees or did the side letter modify all of the collective bargaining agreements between 1969 and 1978; if the side letter was invalid, did Kraftco, nonetheless, properly rely upon it; if the side letter was invalid, is the Fund entitled to the amount for which it has sued or would that be a windfall.

## CONCLUSIONS OF LAW

Although comprehensive Congressional legislation exists in the field of labor law, this case illustrates the overlap and interrelationship of state and federal labor laws. Resolution of the validity of the side letter agreement between the Union and Kraftco adopted in 1969 involves not only the federal requirements mandated in the LMRA and ERISA, but also involves applicable state law, which governs the trust agreements. The plaintiffs have invoked three distinct legal theories to recover the pension benefits in dispute. Under this Court's diversity jurisdiction, the Court reviews the trustee's decision that the side letter agreement has no effect upon the pension contributions required from Kraftco pursuant to the Trust Agreements under the state law of Illinois, which the agreements specify to be the applicable law. Separately, this Court has jurisdiction under the LMRA and ERISA to determine the rights and liabilities of the parties to make pension contributions and what effect, if any, the side letter agreement has on Kraftco's duty under the collective bargaining agreements to make pension contributions to the Fund. The LMRA and ERISA are made applicable because the Fund is not only a common law trust, and thereby governed by state law, but also because the Fund is an employee benefit plan within the meaning of the LMRA and ERISA, § 3, 29 U.S.C. § 1002(3).[1]

---

1. There is no question that the plaintiffs' claim under ERISA and Illinois law are timely. Under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), the plaintiffs seek recovery of past due trust fund contributions and Kraftco's declaratory judgment action against the Union seeks a clarification of rights under the collective bargaining agreements and the trust plan. Under Illinois law, the Fund's action for enforcement of the trust plans is essentially one for recovery of money pursuant to a written agreement. The trust agreements incorporate the collective bargaining agreements, thereby constituting "evidence of indebtedness in writing." In *Jenkins v. Local 705 International Brotherhood of Teamsters,* 713 F.2d 247 (7th Cir.1983), the appeals court applied Illinois law

in an action by an employee to obtain benefits and to enforce and clarify rights under an employee pension benefit plan under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). There the appeals court characterized the case as one asserting claims of *contract law. Id.* at 252. Thus, *the appropriate* statute of limitations was the Illinois contract statute, Ill.Rev.Stat. ch. 110, § 13–206, which provides in pertinent part that "actions on ... written contracts, or other evidences of indebtedness in writing, shall be commenced within 10 years next after the cause of action accrued ...." Here it is apparent that the plaintiffs' commenced this case well within 10 years after the trustees' determination that the side letter

In the present case, the issue of the validity of the side letter agreement, which purports to modify the terms of the collective bargaining agreements in regard to Kraftco's pension contribution requirements, is challenged on the grounds that section 302(c)(5)(B) requires that pension contributions from employers be made pursuant to a written agreement. The plaintiffs maintain that the side letter agreement is an unlawful attempt to abrogate the terms of the collective bargaining agreements and trust agreements. Kraftco counters by asserting that the side letter agreement is effective because it was agreed to by Kraftco and the Union president Don Vestal who had authority to enter such agreements. Moreover, Kraftco contends that because they have relied upon the terms of the side letter agreement, even if it is without any effect, the Union should be estopped from denying the existence of the side letter.

In order to assess the validity of the side letter agreement signed in 1969, this Court is mindful of the temporal scope of the state and federal laws involved. The Court has previously held that the plaintiffs' claims under the LMRA for alleged breaches of the collective bargaining agreements are governed by the general six-year contract statute of limitations in Tennessee. *Central States v. Kraftco, Inc.,* 527 F.Supp. at 422. Thus, the Fund's remedy under the LMRA is limited to alleged breaches since April 20, 1972. *Id.* The applicability of ERISA is also limited, not by virtue of a statute of limitations, but by Congressional fiat ERISA only applies to pension contribution claims that arise after January 1, 1975. *Id.* *See also* ERISA § 514(b)(1), 29 U.S.C. § 1144(b)(1) (a cause of action under ERISA is limited to those that accrue after January 1, 1975). The limitations of the LMRA and ERISA have an important effect in this case because the Fund seeks trust fund contributions from the time the side letter agreement was adopted—June, 1969. Neither the LMRA nor ERISA have any applicability on delinquent trust fund contributions from 1969 until April 20, 1972, at which time the requirements of the LMRA are triggered and January 1, 1975 when ERISA is prospectively applicable. Thus, the threshold issue presented in this case is whether from 1969, the time the side letter was signed, until April 20, 1972, the side letter agreement has any validity. Resolution of this issue requires application of the state law of Illinois.

Under the terms of the Trust Agreements, continuing and prompt payments from Kraftco to the Fund according to the collective bargaining agreements with the Union were required. Moreover, the Union and the trustees agreed to submit all controversies to the Fund's trustees for decision, which would be binding if made in good faith. Pursuant to that authority, the Fund's trustees decided that the side letter agreement had no force or effect.

In reviewing the decision of the trustees that Kraftco is obligated to make past due pension contributions according to the collective bargaining agreements rather than the "make whole" provision of the side letter agreement, this Court applies the state law of Illinois pursuant to the Trust Agreement.[2] Under Illinois law, the

---

agreement was void. *Id.* at 253–54. Thus, the plaintiffs' claims, under ERISA and Illinois state law, are timely asserted.

**2.** In reviewing the trustees' decision under the laws of the state of Illinois, this Court recognizes that the jurisdictional basis for review rests upon 28 U.S.C. § 1332 diversity of citizenship. Pursuant to the doctrine enunciated in *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court must apply the substantive law of Tennessee including Tennessee conflict of laws. *Boatland, Inc. v. Brunswick Corp.,* 558 F.2d 818, 821 (6th Cir.1977)

(citing *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The general conflicts rule in Tennessee governing contracts is that the law of the place of making governs unless the parties express a contrary intent for another state's law to apply. *Boatland, Inc.,* 558 F.2d at 821. In this case the parties have agreed in the trust agreement that all disputes would be governed under Illinois law. Such an agreement is not contrary to the public policy of Tennessee. *Deaton v. Vise,* 186 Tenn. 364, 372–74, 210 S.W.2d 665, 668–69 (1948). Thus, the trustee's decision that the side

scope of review of the trustee's decision is limited to whether the trustees acted arbitrarily or capriciously. *See, e.g., Munts v. Fitzsimmons,* 25 Ill.App.3d 109, 323 N.E.2d 153, 154–55 (1975) (applying arbitrary or capricious standard when reviewing trustees decision in a pension eligibility case). The Illinois arbitrary or capricious standard is consistent with the standard of review of trustees' decisions under the LMRA and ERISA. *Pierce v. Neca-Ibew Welfare Trust Fund,* 488 F.Supp. 559, 564 (E.D.Tenn.), *aff'd,* 620 F.2d 589 (6th Cir. 1980). *Accord Sea Fares Pension Plan v. Sturgis,* 630 F.2d 218, 221 (4th Cir.1980) (Sixth Circuit Judge Phillips explains the arbitrary or capricious standard as not permitting the court to second guess trustees' discretionary judgment); *Aitken v. IP & GCU-Employer Retirement Fund,* 604 F.2d 1261, 1264 (9th Cir.1979); *Reiherzer v. Shannon,* 581 F.2d 1266, 1272 (7th Cir. 1978). As explained by Judge Wilson in *Pierce,* both the LMRA and ERISA require trustees to not only manage the fund as fiduciaries for the participants and beneficiaries, but also to manage the fund in accordance with the documents governing the trust. *Pierce,* 488 F.Supp. at 564.

■ Some courts, however, have questioned the applicability of the arbitrary or capricious standard in reviewing trustees' decision when the decision involves a question of law. *See, e.g., Nelson v. Joyce,* 404 F.Supp. 489, 491 (N.D.Ill.1975). Reasoning that when trustees address the eligibility of an applicant for benefits they are in the best position to interpret the trust agreement, the court in *Steinmetz Electrical Constractors Association v. Local Union No. 58,* 517 F.Supp. 428, 434 (E.D.Mich. 1981) suggested that special deference to the trustees' determination is not appropriate when the sole issue addressed by the trustees is a legal question, such as whether a written agreement is adequate to satisfy the LMRA § 302(c)(5), 29 U.S.C. § 186(c)(5)(B). Although the court in *Ste-*

*inmetz* hesitated to abrogate the arbitrary or capricious standard in reviewing the trustees' decision on a legal question, this Court is persuaded by the reasoning advanced. The Fund trustees in the instant case implicitly recognized this viewpoint when they chose to refer all questions on the validity of the side letter to this Court for resolution. Indeed, the rationality behind deference to the trustees' expertise is removed when the question presented is one arising under the federal labor laws. *See also Local Union No. 5 v. Mahoning & Turumbell,* 541 F.2d 636, 639 (6th Cir. 1976) (concluding that pension fund eligibility standard adopted by trustees could violate LMRA without being arbitrary or capricious). This Court will follow the analysis of the *Steinmetz* court in reviewing the legality of the side letter agreement and not afford the trustees' decision that the side letter is void "any special deference." *Steinmetz,* 517 F.Supp. at 434.

■ Determining the rights and liabilities of the parties in this case also includes analysis under ERISA, § 306(a), 29 U.S.C. § 1145, which provides as follows:

> Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

This Court has jurisdiction to enforce § 306(a) under § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), because this is a civil action brought by the trust fund participants to enforce and clarify rights under the trust plan. The clear purpose of § 306(a) is to simplify collection actions brought by trustees. *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 86–88, 102 S.Ct. 851, 861, 70 L.Ed.2d 833 (1982). Moreover, the requirements of § 306(a) apply to all collection suits pending at the time Congress enacted the provision. *Central States, Southeast*

letter agreement modifying the obligation of Kraftco to make pension contributions is examined under the laws of the state of Illinois.

*& Southwest Areas Pension Fund v. ALCO Express Company,* 522 F.Supp. 919, 925–30 (E.D.Mich.1981). Thus, this case is also controlled by § 306(a) of ERISA.

Although § 306(a) of ERISA is applicable in this case, it requires no additional analysis. There is no question that Kraftco and the Union are bound by the terms of the collective bargaining agreements creating the trust plan and trust fund to which Kraftco is obligated to make contributions. ERISA creates a federal remedy in addition to a state remedy for breach of a contract when an employer fails to make proper pension contributions under the collective bargaining agreement and the trust agreements. *Lewart v. Woodhull Care Center Associates,* 549 F.Supp. 879, 885 (S.D.N.Y.1982); *Central States Southeast & Southwest Areas Pension Fund v. ALCO Express Company,* 522 F.Supp. at 929–30 (E.D.Mich.1981). If the plaintiffs demonstrate that Kraftco's failure to make proper trust fund contributions was without any legal right, then the plaintiffs have proven not only a violation of ERISA, but also shown that the Trustees' decision that the side letter is void was legally correct. The pertinent issue, therefore, is whether the side letter agreement alters the provisions of the written collective bargaining agreements and trust agreements. ERISA specifically provides that its provisions neither alter, amend, modify nor in any other manner transgress any other federal laws. ERISA § 514(d), 29 U.S.C. § 1144(d). Thus, in enforcing the requirements in § 306(a), this Court need only determine whether the side letter agreement is valid. In making that determination, the requirements of § 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5) are applicable, given that it is the plaintiffs' position that this section makes the side letter agreement illegal.

The acid test to determine the validity of the side letter agreement is the LMRA requirement that prohibits a labor organization such as a trust fund from accepting contributions unless "the detailed basis on which such payments are to be made is specified in a written agreement with the employer ...." LMRA § 302(c)(5)(B), 29 U.S.C. 186(c)(5)(B). The Congressional purpose for this written agreement provision is to insure that the trust funds are not tampered with or used for illicit purposes. *Alvares v. Erickson,* 514 F.2d 156, 164 (9th Cir.1975). After Congressional investigations verified that union officials were misappropriating funds exacted from employers for employees benefit programs, *Monglia v. Geoghegan,* 403 F.2d 110, 115 (2d Cir.1968), *cert. denied,* 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969); *Seafood Workers Health Fund v. Management Trustees,* 571 F.Supp. 483, 485 (D.Mass.1983), Congress imposed rigid requirements in § 302(c)(5), 29 U.S.C. § 186, including the absolute mandate that all contributions to trust funds be specified in a written agreement. Absent a written agreement, a binding trust cannot exist for employer contributions and the parties making and accepting such contributions violate § 302(c)(5) of the LMRA. Further, the intended beneficiaries have no legal right to benefits derived from union pension funds. *Moglia,* 403 F.2d at 116.

Although the written agreement requirement in § 302(c)(5)(B) is typically satisfied in the form of a collective bargaining agreement, § 302(c)(5)(B) does not preclude the use of other types of written agreements. *Moglia,* 403 F.2d at 115. Indeed, in *Doyle v. Shortman,* 311 F.Supp. 187, 193–96 (S.D.N.Y.1970) and *Hinson v. NLRB,* 428 F.2d 133, 139 (8th Cir.1970), the courts held that the trust agreements adopted pursuant to the collective bargaining agreements satisfied the written agreement requirement of § 302(c)(5)(B). As explained in *Doyle,* § 302(c)(5) "nowhere refers to a collective bargaining agreement in haec verba. This is significant, for if Congress—in this statute dealing extensively with collective bargaining—had intended to require a collective bargaining agreement to the exclusion of any other written agreement, canons of construction dictate the conclusion that it would have said so." *Doyle,* 311 F.Supp.

at 195. Neither an oral collateral agreement nor an oral modification of a written trust fund agreement is acceptable, *San Pedro Fishermen's Welfare v. Di Bernardo*, 664 F.2d 1344, 1345 (9th Cir.1982); *Gratliff Coal Co. v. Cox*, 152 F.2d 52, 52 n. 1 (6th Cir.1945). Moreover, a written agreement does not exist by implication from the parties minor differences in writings never accepted. *R.V. Cloud Co. v. Western Conference of Teamsters Pension Trust Fund*, 566 F.Supp. 1426, 1428 (N.D.Cal.1983).

The approach of the Ninth Circuit in *Maxwell v. Lucky Construction Company*, 710 F.2d 1395 (9th Cir.1983) is illustrative. In that case, written collective bargaining agreements between the employer, Lucky Construction Company (Lucky), and two local unions required Lucky to make contributions to respective trust funds for its employees. In order to entice a particular employee, John Sampson, to remain with it, Lucky agreed to make greater contributions for Sampson to a different trust fund. Sampson's local union representative orally approved of the arrangement. The district court, relying on *Waggoner v. Dallaire*, 649 F.2d 1362, 1366 (9th Cir.1981) (holding an oral modification of a trust agreement invalid under § 302(c)(5)), found in favor of the trustees of Sampson's previous trust fund and against Lucky on the grounds that § 302(c)(5) of the LMRA forbids pension payments under an oral modification of a written collective bargaining agreement.

On appeal, Lucky argued that *Waggoner* was inapplicable because none of the policy considerations that were invoked in *Waggoner* were present in Lucky's case. Although agreeing with Lucky on the lack of similar policy considerations, the appeals court in *Lucky* held that neither lack of secrecy, fairness of the oral arrangement, knowledge and participation of the employee or even the employee's and the local union representative's waiver of the protection in § 302(c)(5) negated the absolute requirement that all employer contributions be made pursuant to a written agreement. Any qualification of the requirements em-

braced in § 302(c)(5) "would render the protective writing requirement less effective by exposing both union and employer to corrupt bargain temptation." *Maxwell*, 710 F.2d at 1398.

The same anti-corruptive concerns were expressed in *Lewis v. Seanor Coal Company*, 382 F.2d 437 (3rd Cir.1967), where the appeals court affirmed the district court's conclusion that an oral side agreement was void under § 302(c)(5)(B). In *Lewis*, the appellate court reasoned that it would be "incomplete to require for the benefit of the employees and to prevent collusive or fraudulent side agreements between employers and union representatives that the benefits which the employees are to receive from union welfare funds shall be specified in a written agreement with the employer and yet to permit the written foundation on which the welfare funds rest ... to be the subject of oral modifications." *Id.* at 443. The prophylactic policy in § 302(c)(5) guarantees that employer payments into trust funds, as well as employee benefits, be controlled pursuant to a written agreement. *Moglia*, 403 F.2d at 116; *Lewis v. Lowry*, 295 F.2d 197 (4th Cir.1961), *cert. denied*, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962) (Soboleff, C.J. dissenting). Thus, maintaining the rigid structure of § 302(c)(5) from any erosion is the best guarantee against "an unintended loophole for the unscrupulous" that may harden the financial cushion created for employees and their families and render meaningless the primary obligation of employers to contribute. *Mogilia*, 403 F.2d at 116. *See also Lewis*, 295 F.2d 201.

■ It is the conclusion of this Court that the side letter of June 26, 1969 did not modify the terms of the milk plant bargaining agreement executed on June 27, 1969, the ice cream plant bargaining agreement executed later that year, or any succeeding agreements. The side letter is an obvious attempt to circumvent the terms of the collective bargaining agreements and clearly violates § 302(c)(5)(B), 29 U.S.C. § 186(c)(5)(B). The side letter was not

presented to the Union membership for ratification as required by Union by-laws, nor was it communicated to the affected Union members. Kraftco, as a signatory of the collective bargaining agreements, either knew or should have known of the ratification process. Thus, this Court rejects as unfounded Kraftco's contention that Vestal had any authority implied or apparent to approve the side letter. Although there is a history of occasional side letters between Kraftco and the Union, most of them concern routine matters not covered by any collective bargaining agreements. The letter of November 8, 1966 modified the collective bargaining agreement without ratification by the membership, but this does not establish a binding prededent upon which Kraftco may rely. The critical distinction between the side letter agreement at issue in this case and the other side letters between the Union and Kraftco is that the previous side letters, unlike the side letter in question, did not diminish the rights of any Kraftco employee—Union member.

The Congressional concern embodied in § 302(c)(5)(B) to protect union funds exacted from employers for employees and their families would be frustrated if a union official could unilaterally bind the Union to a side letter agreement with the employer, absent any authority or notice to the Union. The objective of Congress is plain. Employer payments to trust funds must be pursuant to a written agreement with a detailed basis for payment. Although the written agreement may be modified, that can only occur pursuant to proper Union authority. No such authority was delegated to Vestal in the present case and, more significantly, the side letter agreement was never ratified by the Union according to the Union's by-laws in 1969 or thereafter. The side letter agreement Vestal entered into with Kraftco to govern Kraftco's contributions to the trust funds was an illicit attempt to alter the effect of the written collective bargaining agreement. Such a practice is precluded under § 302(c)(5)(B).

Additionally, the inefficacy of the side letter under § 302(c)(5)(B) perforce re-quires that the side letter not stand under ERISA. Applying the arbitrary or capricious standard to review the trustee's decision under Illinois law or affording no deference whatsoever to the trustees' determination, this Court is of the opinion that the side letter agreement is void. Indeed, given the contravention of the side letter agreement with § 302(c)(5)(B), the trustees' determination that the agreement was without effect is far from arbitrary or capricious. Similarly, ERISA's requirement that an employer properly make contractually obligated contributions to trust funds does not disturb any federal law. Thus, Kraftco's failure to abide by the collective bargaining agreements and trust agreements relative to its obligation to trust fund contributions violates Illinois trust laws, ERISA and the LMRA.

 The Court now turns its attention to the alternative argument of Kraftco that if the side letter is deemed invalid, the plaintiffs are estopped from denying the provisions in the side letter due to Kraftco's justifiable reliance. In addressing this issue, the Court will apply federal law on estoppel. *Thurber v. Western Conference of Teamsters Pension Plan,* 542 F.2d 1106, 1108 (9th Cir.1976). Estoppel arguments have been regularly advanced in circumstances when an employee is seeking to claim a right to a pension from a Union trust fund. *See, e.g., Steinmetz,* 517 F.Supp. at 435; *Hodgins v. Central States Southeast and Southwest Areas Pension Fund,* 624 F.2d 760, 762 (6th Cir.1980) (Jones, J., concurring); *Thurber,* 542 F.2d at 1109. Here, Kraftco maintains that its past reliance on the side letter agreement is sufficient to supply the modification to the written collective bargaining agreements and trust agreements that this Court has disallowed under § 302(c)(5)(B).

 Kraftco correctly asserts that the Fund and the Union each had a duty to monitor the employer contribution. *Central States Pension Fund v. Central Transport, Inc.,* 522 F.Supp. 658, 664–65 (E.D.Mich.1981). Kraftco takes the posi-

tion that it relied to its detriment on the practice that the Fund had an affirmative duty to monitor, thus the Fund should be estopped from asserting that the side letter practice was improper. Under the circumstances of this case, estoppel as applied against the Union and the Fund would have the undesirable effect of permitting Kraftco to bypass the protective concerns embodied in § 302(c)(5)(B). The written agreement provision serves the purpose of specifying the employer's duty to make contributions as well as detailing the employee's expectations from the trust fund. The anti-corruptive concerns embodied in § 302(c)(5)(B) would be frustrated. Thus, this Court concludes that estoppel provides no basis for Kraftco to avoid its obligations under the collective bargaining agreements to make trust fund contributions.

There is clear proof that Vestal had no authority to bind the Union and that Kraftco should have realized Vestal's lack of authority. Also, the Union never ratified the agreement to indicate its knowledge of the side letter on which Kraftco could claim justifiable reliance. Moreover, in that the Fund had no dealing in the formulation of the side letter agreement, it is unlikely that estoppel could divest its claim. The Fund's right to expect proper contributions from Kraftco could not be undermined by secret side agreements in which the Fund's trustees never participated. *Lewis v. Lowry,* 295 F.2d at 202–03 (Sobeloff, C.J., dissenting). In sum, this Court rejects Kraftco's promissory reliance theory to save the illegal side letter agreement.

■■■ Having decided that the side letter agreement has no force or effect under the LMRA, ERISA or the law of Illinois and that no estoppel theory saves the side agreement, the Court now addresses whether the trustees acted properly in demanding all contributions due under the collective bargaining agreements. The basic concern is whether requiring Kraftco to pay delinquent fund contributions gives the Fund a windfall as Kraftco suggests or is such remedy necessary to protect the actuarial integrity of the Fund. Given that a

suit for recovery for enforcement of trust fund contributions is equitable in nature, *Wardle v. Central States, Southeast and Southwest Areas Pension Funds,* 627 F.2d 820, 829–30 (7th Cir.1980), a windfall to the trust must be avoided.

■■■ Kraftco is obligated to make trust fund contributions pursuant to the collective bargaining agreements and trust agreements. In doing so, the Fund receives no windfall because the Fund actually represents thousands of unique agreements between the Union and many employees. Multi-employer pension funds like the plaintiffs have many contributors and many beneficiaries. The relationship between contributors and payments to beneficiaries is not personal and precise. An employee and his family are not necessarily due to receive the contributions he has made. Indeed, some potential beneficiaries never achieve the required period of service so their right to benefits from the trust never vests. Similarly, some employers fail to fulfill their obligations to the trust fund. For example, this Court recognizes that some employers bankrupt while in arrears on trust fund contributions. Under these circumstances, this Court believes that Kraftco's payment of contributions upholds the actuarial integrity of the trust and thereby yields no windfall.

An appropriate ORDER will enter declaring that the Fund and Union are due pension contributions from Kraftco pursuant to the collective bargaining agreements.

## ORDER

Pursuant to the contemporaneously filed Memorandum of Law issued this day in the above-styled case, the side letter agreement adopted in 1969 between the Union and Kraftco governing Kraftco's pension contributions is hereby declared null and void. Judgment enters for the Fund and Union and against Kraftco in the stipulated amount of $246,395.00. Interest on this amount will be calculated from the date payments became due to the date when payments are made, together with all the expenses of collection.

It is further ORDERED that the Fund and Union shall within thirty (30) days, prepare and submit to the Court a computation setting forth the amount of interest and expenses of collection incurred. Kraftco shall have fifteen (15) days thereafter to make objections or comments. If any matter remains unresolved, this Court will set a hearing to determine the amounts of interest and expense of collection.

It is further ORDERED that the motion in limine and motion to dismiss by Kraftco in case No. 78–3135 us DENIED as moot.